State v. Packwood.

THE STATE, Respondent, v. PACKWOOD, Appellant.

1. A. was indicted for the murder of B. At the trial it appeared in evidence that the homicide took place under the following circumstances: A. went to the house of one of B.'s tenants for the purpose of returning some coffee borrowed by his wife; B. accidentally learning that A. was present at the house of the tenant, went there with the intention of beating him with a stick or club which he had picked up before he started; B. entered the house and ordered A. to leave, which order he immediately set about to obey by starting away through a door opposite to that at which B. stood with his club; B. commanded him to turn and pass through the door at which he stood; he did so and as he passed through the door B. commenced striking him, he moving off rapidly; B. followed and continued beating him severely with the club as he ran; after running from forty to eighty yards, A. turned and inflicted a single blow with a knife which proved fatal; A. continued running and was shot in the back or side by a brother-in-law of B., who, together with his father, had accompanied B. when he started to attack A. There was evidence showing a feeling of hostility existing between the parties and antecedent threats made by A. against B.; certain persons—who were privy to, and participants in, an attempt to get up a mob to lynch and hang A., and who had, in the guise of friends but in concert with those proposing to lynch him, obtained admittance to his house on the night of the contemplated mob, and whose testimony was otherwise discredited—also testified that A., while confined to his bed in consequence of the wounds and bruises received by him, declared in their presence that when B. ordered him to leave the house, he (A.) intended to kill him on the door-sill, but, seeing others about, he concluded not to kill him until he had drawn him away from the presence of his friends, when he could have some chance of escape. There was no evidence showing or tending to show that A. went to the house of B.'s tenant with the view of provoking a difficulty with B.. The court gave the following instruction to the jury: "If the jury believe from the evidence that the defendant went to the house or mill of deceased and one T. S. Talbot with the intention of provoking a difficulty with the deceased in order that he might take the life of deceased, John T. Dougherty, and that he did provoke a difficulty with the deceased pursuant to such intention, which resulted in the death of Dougherty, they will find him guilty, although they should believe that the deceased, Dougherty, committed the first assault." The jury found the defendant guilty of mur-

State v. Packwood.

der in the first degree. No exceptions were taken *or saved* to the rulings of
the court by the defendant.
*Held*, that the testimony adduced did not warrant the verdict of guilty of mur-
der in the first degree ; that the court erred in giving the above instruction
inasmuch as there was no evidence to support it.

*Appeal from Caldwell Circuit Court.*

The defendant, Larkin Packwood, was indicted for the
murder of John T. Dougherty. The case was removed by
change of venue from the circuit court of Davis county to
the circuit court of Caldwell county.

At the trial the following testimony was introduced in be-
half of the prosecution :

Henson Bennett, a witness on the part of the State, states,
he knew defendant and John T. Dougherty, the deceased ;
in December last, about the middle of the month, heard de-
fendant say that Talbot and Dougherty were stealing grain
and ought not to live ; afterwards heard defendant say that
they stole his hogs and corn, and ought not to live ; that he
intended to kill them the first opportunity he could provoke
them to a difficulty, so that he could have the law in his
favor ; soon kill them as a parcel of dogs—alluding to Judge
Talbot, Jim Talbot, and John T. Dougherty ; saying at the
same time he had what to do it with ; the first of the above
conversations happened along the road from Gallatin to de-
fendant's, between where McHenry lived and Thomas Blaks-
ley's, about three miles from defendant's residence.

Cross-examined. Witness said he was at Talbot's mill on
the day of the difficulty ; saw David Enyart there ; had some
conversation with him ; asked Enyart whether there was any
mob up ; he, witness, concluded from circumstances that
defendant ought to be mobbed and hung ; it was his own
notion ; heard nobody else say so ; then admitted he did ; did
[not] ask Mr. Enyart or anybody else to join the mob ; but
told Enyart that Packwood ought to be compelled to leave the
neighborhood ; stayed at Talbot's three days after Dougherty
was killed ; had no business there ; no writ out to arrest
defendant for three days ; if a mob had existed, the intention

to mob the defendant had been abandoned before he was arrested; at the time I met Packwood, between McHenry's and Blaksley's, he was riding a bay nag.

Luther Farrington, another witness on the part of the State, says: had a conversation with the defendant some two weeks before Dougherty was killed; defendant said he would have satisfaction by fair means or by foul means. Cross-examined. Said: Don't know what defendant was talking about when he made the above remarks, but understood him to be complaining of the treatment he had received at Dougherty and Talbot's mill in relation to corn and sacks which he said he had lost at the mill.

Jacob Snyder, on the part of State, says: He was a little acquainted with defendant; knew him for about five years; was present at the difficulty in which Dougherty was killed; it happened in March last, about the 9th of the month, at or near Talbot's mill, in Davis county, Missouri; he, witness, lives at the mill; is hired to Talbot & Dougherty; lives in one of their houses, but pays no rent; has a family who reside with him in said house; the house is under their control; defendant came to his house that morning; defendant was in the house when Dougherty came to it; Dougherty went into the house where defendant was; saw defendant come out of the house, and as he came out Dougherty commenced striking him with a stick or club; defendant commenced running, and Dougherty pursued him, hitting him with his club as he ran; after running some distance, about fifty yards, defendant turned round and struck Dougherty with his knife; Dougherty died of the wound in about one hour; when defendant came out of the house Dougherty commenced striking him; the stick with which he struck was about one inch in diameter and three feet long; at the time of the difficulty witness was standing between house and mill; the house and mill are about one hundred yards apart; defendant had got to or near the timber or brush when he turned round and struck deceased; Judge Talbot was there; Richard Hale and Arnold were there also about the mill;

witness heard Dougherty warn defendant not to come upon the premises.

Cross-examined. Witness said: John T. Dougherty, the deceased, lived about one and a half miles from the mill, and Talbot about the same distance; Dougherty and Talbot and witness were at the mill when they heard defendant was at the house where witness lives; Judge Talbot went with Dougherty from the mill to the house where defendant was; Dougherty took a stick and Talbot had a double-barreled shot-gun; witness preceded Dougherty, at the request of Dougherty, to the house, and called his wife to the door and told her to come out as Dougherty was going to make defendant leave; this instruction and information was not heard by defendant who was in the inside of the house; witness did not know what was going to be done; Judge Talbot accompanied Dougherty from the mill to the house, and Jim Talbot was some little distance from the house; Dougherty struck defendant as he ran a good many times, defendant running all the time, and halloed, as he [was] stabbed, "oh! Lord," or something of that sort; after defendant struck Dougherty with the knife, he kept on running and did not repeat or offer to repeat the stroke; when Dougherty was struck with the knife he stopped the pursuit and threw his club after defendant; soon after that time heard the crack of two or three guns, fired as he supposes at defendant; saw Jim Talbot with the gun about that time; there had prior to this time been acts of neighborhood kindness between defendant and witness and their families; on that morning defendant came to his house to return some coffee his wife had borrowed of witness's wife; don't know any thing about the mob; heard some talk of it; did not intend to join it, but was solicited to do so; defendant lives about one mile from the mill; shortly before that, Talbot and Dougherty got two lin logs from defendant, and Talbot, as witness understood, also sent to defendant and got a load of straw to put up ice in; this was some time in February last.

Nathan Snyder, on part of the State, says: That he heard

a conversation between defendant and Dougherty last February, at the time when the witness and defendant had a quarrel about a piece of paper stuck up on a tree affecting witness; witness had been told defendant had set up said writing, and had called on defendant to know if he did. Defendant denied having done so, and said there were others about there more apt to do such a thing than him. Dougherty in some way heard or understood that defendant had charged or insinuated that he or the Talbots had set up said writing, and called defendant to account about it. Defendant denied having made any such charge or insinuation. Dougherty appeared angry and a good deal excited about it; and forbid defendant to come about the mill, saying if he did it would be at his own risk.

Cynthia Snyder, on the part of the State, says: That she is the wife of Jacob Snyder, and lives at the house near Talbot's mill; on the morning Dougherty was killed, defendant came to her house to return some coffee defendant's wife had borrowed of her; shortly after defendant came to her house, and while he was sitting in the room, Mr. Dougherty came in and ordered him out, and, just after defendant got out, Dougherty struck him with his stick, and defendant went off in a sort of trot, Dougherty striking him with the stick as he went; the stick was about the size of a chair post; so soon as defendant was ordered to leave by Dougherty, he got up out of the chair where he was sitting and started out, and Dougherty followed him out of the house; about the time of the difficulty between Nathan Snyder and defendant, defendant was at my house, and, speaking of said difficulty, he exhibited a knife which he held in his hand, and said that he did not carry that knife for Nathan Snyder or any body else in particular, but when he drew it, he would draw it to kill; when defendant got up to leave the house, he told Dougherty not to strike him with that stick, as he had done or said nothing to justify it; defendant had not been there more than a quarter of an hour before Dougherty came and ordered him out; I got the message from my husband to come out;

that Dougherty was coming to flog defendant, and make him leave; but did not warn him or communicate the message to defendant. On that morning, defendant was talking about some hogs he had in the bottom near the mill, and also some pigs he had given witness, saying they had returned to his house, and she had better send and get them; defendant was also talking about Dougherty; did not hear him threaten Dougherty, but he was inquiring of witness what she had heard Dougherty say about him; there were two doors in the house when defendant was there; deceased came in and ordered him out; defendant attempted to go out at one door, but was commanded by deceased to turn and go out at the door where deceased was standing with his club.

W. E. Hale, a witness on the part of the State, says: That he was at the house of the defendant on the night after Dougherty was killed, and stayed all night; when there on that occasion had a conversation with defendant about the difficulty; defendant said he had gone to Snyder's that morning to carry some coffee home his wife had borrowed of Mrs. Snider, and while there, Dougherty came in and ordered him out; when he got up to leave he intended to kill Dougherty on the door-steps, but seeing some persons about the door he concluded if he did they would kill him, and he concluded not to kill him till he got him out from the presence of his friends, when he could have some chance of escape; that he had done what he intended to do, and that was but a beginning; that he would serve Judge Talbot and Jim Talbot the same way, if they interrupted him, and showed the knife to witness; it was a long knife—the blade being about six inches long, and edged on each side, with a ridge in the middle—and was carried in a scabbard and had a guard.

Cross-examined. Witness said: There had been hard feeling between witness and defendant; on Tuesday night after the difficulty went to the defendant's house in company with Levi Murray, between ten o'clock and next morning; defendant said, in the conversation above alluded to, that when Dougherty ordered him out he told Dougherty not to strike him, as

he had done nothing to justify it; that as soon as he got out of the door Dougherty commenced beating him with a club, and he commenced running off, and that Dougherty pursued him, and continued to strike with his stick all the way; that he examined the wounds of defendant and found his shoulders were bruised smartly, and a knot on his head; shoulders were considerably black and blood-shot; defendant said all these wounds and bruises about the back and shoulders and head were inflicted by Dougherty before he struck him with the knife; heard the mob talked of; did not agree to it, but encouraged it; its object and purpose was to hang defendant; witness refused to join the mob; stayed all night with defendant on Monday night and Tuesday night; went there to minister to defendant from friendship and sympathy; understood that night (Wednesday night) had been fixed upon to hang defendant, and on that night, about ten o'clock, went to defendant's house in company with Levi Murray; when we got to defendant's house that night we found the doors barred up; Murray got in at the window and so did he; he told him of the mob; he was going there that night; after getting there Murray went home after his gun and returned; defendant's family refused to let us in at first for fear we were part of the mob which they had heard was coming that night to hang the old man (the defendant), but upon learning who we were, they let us in at the window; expected the mob there that night, and went there to keep anybody from being killed, the defendant excepted; did not know till next day that the mob had been abandoned; when defendant said he had determined to kill Dougherty, he understood him to refer to the intention formed at the time Dougherty ordered him out and Dougherty was standing on the door-steps; Levi Murray was present at this conversation and is the same conversation testified to by Murray before the examining court; witness states that witness testified before the examining court that his testimony was the same as Levi Murray's, and he was not examined.

Levi Murray, a witness on the part of the State, says: That

State v. Packwood.

about the 1st of February, in a conversation with defendant about the difficulty with Nath. Snyder about the notice set up on a tree in reference to said Snyder, defendant remarked that he had met Nath. Snyder at the mill to clear up that matter about the notice, and that they had threatened to take his blood, but if they did'nt mind he would get theirs first. He also said he had met Dougherty in Gallatin afterwards and invited him to step up at Wirt's store and he could clear up that report about the notice about Snyder, but that Dougherty turned off and refused to go and hear an explanation.  On Monday night after Dougherty was killed, heard defendant say at his house that he had gone to Snyder's to carry some coffee home his wife had borrowed of Mrs. Snyder, and when he was there Dougherty came in and ordered him out; that he started out; that as he went out it was his intention to cut his heart out of him before he got off the door-sill, but seeing Talbot and others there he was afraid, if he did, the Talbots would instantly kill him, and he concluded to toll him off and then kill him and make his escape.  Defendant asked witness if he was not surprised when he heard of his killing Dougherty ; witness told him he was ; and defendant told witness that he was not surprised ; that he had not done any thing more than he had intended to do for some time.  Defendant also said he thanked God he had got home with some of Dougherty's blood and fat and flesh upon his knife, and pointed to the knife hanging upon the wall.

Cross-examined.  Witness said, that defendant also said that he saw from the way Dougherty came at him and his continued infliction of blows with the club, he would have to kill him or be killed ; he showed some wounds, and back and shoulders bruised up smartly.  He was a friend to defendant, and went there as his friend to help him ; it was a friendly feeling he had for defendant that took him to the house of defendant ; in the morning went back to Talbot's and ate breakfast there ; went to town after socks for deceased ; got back from town after night, and went to defendant's in company with W. E. Hale ; defendant asked him to come

back on Monday night. Dr. Dewy asked me to stay and wait on defendant and lay him out if he died; was at Talbot's on Monday; good many people there on Wednesday night; Wednesday night went back to defendant's, at his request and on that account; found the doors barred up and got in at the window; went back home for his gun to defend himself from defendant; they (the defendant's family) said they had heard a mob was coming that night to hang the defendant; witness had also heard this at the mill; was asked to join the mob; thought it was right to hang him; did not solicit any body to join the mob; saw Mr. Payne at the mill; Payne said if it had been in Clay or Platte defendant would have been hung that day; that he ought to be hung right off; Morrow was by and heard what was said; he did not know, for certain, that the mob would come that night, but he rather expected it; it was his intention to see that nobody got hurt except the defendant; went back after his gun to defend himself from defendant; was one of the mob; consulted with them about it, and talked to them about the danger of going to defendant's; when he went after his gun he went by Talbot's, and saw there the Doughertys, brothers of the deceased, and a stranger, and told them that the Packwoods had the doors barred up, and that the family were armed with corn knives, scythe blades, axes and guns, and that it would be dangerous to go there or attack them. It was his purpose to disarm the family, if he could, in case the mob came.

Sarah Osborne, on the part of the State, says, that [she was] at Snyder's house before the fracas; heard defendant say nothing about Dougherty.

Dr. Hogan, on part of the State, says: He was called to examine the wound of Dougherty; found him dead with a stab on the left side, about the tenth rib, one inch wide, and five deep; one rib cut in two; and believes said wound was mortal and caused his death.

Alphonso Martin, on part of State, says: That a few days before Dougherty was killed, defendant came to Dougherty in Gallatin, and wanted to say something to him; but Dough-

erty told him not to talk to him, and go away, which defendant did.

—— Minor, on part of State, exhibits a knife, which he found with the defendant when he was arrested; defendant told him he had carried that knife about ten years.

Thornton S. Talbot, a witness on the part of State, says: That there was not much sociability between defendant and Dougherty, the deceased; the deceased was his son-in-law; that defendant was indolent and meddlesome with their hands about the mill; that witness and Dougherty had both ordered defendant not to come about their premises. On the day Dougherty was killed, Dougherty went to the house where Snider lived, and in which defendant was at the time, and ordered defendant to leave; witness went in at the door of an adjoining room, about the time Dougherty went in at the other, to see that no more than one should jump on Dougherty, as Dave was there. Witness was about the door when defendant came out. Dougherty, before leaving the mill for the house where defendant was, told him he was going there to thrash defendant, and he went on with him. Dougherty took a stick with him, and I had my gun in my hands, which I usually carried to shoot partridges—a double-barreled shotgun. After Dougherty was stabbed, my son James wrested the gun out of my hands; soon after that time heard two guns; when Dougherty was stabbed he turned back; said he was killed; we went to meet him; Dougherty said to my son James, " Jim, avenge my death;" Jim replied, " I will do it or die;" he and Dougherty were partners in the mill, but not in the soil or land; says there was no agreement or concert between him and Dougherty about attacking defendant; there was no mob organized to hang defendant to my knowledge; was consulted about it; asked how I felt about it; said he thought defendant ought to be hung, and would go into a mob of that sort for that purpose; sent note to Mr. Payne to know if he was still in the same mind in reference to mobbing defendant, and if so his presence was required at my house; I told Hale and Jim Murray to examine the con-

dition of defendant for fear he might escape, and to report his condition to witness, as to the extent of his injuries, &c. The neighbors were all in the mob; witness said some difficulty or misunderstanding had arisen between witness and defendant about an open line between witness and defendant; they owned each one-half of a quarter section of land, and the line between them was unascertained; witness cleared off a piece of ground, as he supposed, on his own part of the tract, but near the line; witness had some hands at work clearing up ground and building some houses. Defendant came there, and ordered them to stop, saying we were on his land. I told him if I was it was an innocent mistake, and that defendant should have informed him sooner; defendant showed witness where he supposed the dividing line between them was, and that he commenced his improvements accordingly; defendant afterwards came and said I must quit trespassing and building on his land; told defendant he had built according to the line as he showed him; defendant replied he had been mistaken as to where the line was; that they were still on him. Witness states that he and Dougherty frequently warned defendant not to come upon their premises.

Upon cross-examination, witness said: Don't know how the news of defendant's being at the Snyder house came up to the mill; that morning, before he got to the mill or heard of defendant's being at Snyder's, had a conversation with Dougherty about defendant; Dougherty said he had heard the evening before that defendant had been slandering him, and that he (Dougherty) meant to thrash him; Dougherty appeared excited about it; shortly after we got to the mill the news came that defendant was at Snyder's; Dougherty told the men at and about the mill, as he stated, that he was going to thrash defendant. I went up to the house, where defendant was, with Dougherty; Dougherty went to whip him and make him leave because he heard that defendant had slandered him; when defendant came out of the house Dougherty followed him out and commenced hitting him with his

stick; defendant commenced running and Dougherty pursuing him, and striking him with his stick as he ran; defendant ran from forty to sixty yards; had been struck as many as five or eight times at least; defendant was still fleeing, and being pursued and being struck by Dougherty, when he turned upon him and stabbed him once, and then immediately continued his flight and commenced hallooing; soon after that time heard guns shot; Snyder was tenant at will in that house; he thought defendant ought to be hung and acquiesced in the proposition to mob him; the whole community were in it; the reason why defendant was not arrested until after three or four days was because it was thought to be an act of inhumanity to have him arrested in his crippled condition; yet he assented to the proposition to hang him by a mob; W. E. Hale, Bennet and Murray were in the consultations about mobbing the defendant, and assented to it; witness and others gave different opinions at different times in regard to the propriety of mobbing defendant, but witness and others finally concluded that it was best to let the law take its course.

Clark, for the State, says: He was going to Talbot's mill, and defendant told him they were stealing corn, &c., and not to go; he accordingly turned and went to Farrington's mill.

The following testimony was introduced in behalf of defendant:

William Wickiser, for the defendant, says: On Tuesday, before Dougherty was killed, in a conversation with Dougherty about the difficulty of Nath. Snyder with defendant, he inquired of Dougherty if defendant had been back to the mill since the difficulty with Nath., and he replied that defendant knew better than to come back, for if he did he would take his *damned* old life, or *infernal* old life—don't know which; witness was at the mill the day of the difficulty with Nath. Snyder; just before the quarrel between Nath. and defendant commenced, Dougherty got a bowie knife of one Rader at the mill and went in the direction of Nath. and the defendant at the time of the quarrel; did not see the

affray; after the difficulty with Nath. Snyder and defendant, saw Dougherty return the knife to Rader; this was about the 2d of February last. Witness did not know of any difficulty between defendant and deceased before the time he asked deceased if defendant had been back to the mill as above stated.

Dr. Dewey, a witness for defendant, says: That he saw the defendant on the evening he was wounded (the day Dougherty was killed); found defendant bleeding freely; breathed hard, and spitting blood; examined his wounds; found his back and shoulders badly bruised by severe blows; counted eleven severe bruises on back and shoulders, as if done with a club or stick; from shoulders to point of his ribs all bruised up; spit up in a short time while I was there a pint or more of blood; at first thought he would die; did not invite or desire Murray to stay there that night to wait on him or lay him out; defendant was also wounded with a gun-shot in the side. It was about six inches from where it went in to where it came out; it did not enter the hollow or cavity.

Charlotte Packwood, a witness for defendant, says: That from 3d of December last to about the 6th or 10th of January last, defendant did not go to Gallatin, or elsewhere off the place; that we [he] was there about the 1st of December last; that defendant (her father) was sick and confined mostly to the place or home from the 3d of December, and was not out from home far till some time about the 10th of January, when he last went to Gallatin aforesaid; rode a gray horse and not the bay; on the morning Dougherty was killed, her father went over to Mr. Snyder's to carry some coffee home her mother had borrowed of Mrs. Snyder; and also took some ears of corn along with him to hunt some of his hogs that ran about the mill; her brother, Daniel Packwood, accompanied her father to help toll up the hogs if they found them, carrying the corn for that purpose. After a while her father returned badly hurt and beat up, and said he was killed and was very sick; he was badly bruised about the back and shoulders, and had a gun-shot wound in

the side ; heard the conversation between Murray and defen-
dant; her father did not tell Murray he had brought home
on his knife some of Dougherty's blood, fat and flesh ; heard
a conversation between her brother Dan and Murray on that
occasion, in which Murray asked Dan if there was any of
Dougherty's blood on the knife, or any of his fat, or any of
his meat, to which inquiry Dan told him to look and see for
himself, there was the knife ; is satisfied no such conversa-
tion took place between her father and Murray as referred to
by Murray and Hale ; was by all the time and heard all that
was said.   On Wednesday night Murray and Hale came to
their house (defendant's) about ten o'clock ; the doors were
barred up to keep out the mob, which they had just heard
was coming that night to hang her pa ; upon hearing that the
mob was coming that night they had barred up the door the
best they could, and brought into the house every weapon of
defence they could find—a corn knife, a scythe blade, an
axe, and some guns, which they intended to use if the mob
made an attack upon them ; she intended to defend her pa
to the last or die.   Murray and Hale got there that night
about ten o'clock, and professed to be their friends, and told
them there was no mob coming ; as the doors were all barred
up, they crept in at the window ; they assured us they were
friends, and that there was no danger.   Murray insisted on
unbarring the door.

John Green, for defendant, says : I saw Packwood, the
defendant, in Gallatin about the first of December last ; came
up to sell some pork and was there a day or two and then
went home.

Richard Hale, for defendant, says : He was at the mill the
day Dougherty was killed ; heard Dougherty and some of
them about the mill talking about flogging defendant, and
driving him off the place ; witness advised Dougherty not to
make the attack ; there was vinegar in him ; that he was a
dangerous man ; Dougherty replied he would give him a
chance for his vinegar ; and on he went towards Snyder's,
where defendant was ; Dougherty took with him a stick, such

as was commonly used in a windlass in drawing up dirt out of the well or cistern; Jim Talbot invited witness to go along and see the fun of flogging Packwood and driving him off; witness saw defendant running and Dougherty after him beating him with a stick; defendant must have run from forty to eighty yards or more, while Dougherty was striking him all the way, before he turned and stabbed deceased.

Andrew Arnold, for defendant, says: That he was at the mill on the day of the difficulty; heard Dougherty and Talbot talking about defendant being at the mill; Dougherty said he meant to make him leave, that he had charged him time and again not to come there; Dougherty took a stick and Dougherty and Talbot went to the house where defendant was; saw Dougherty striking defendant with a stick, and defendant running from him; after the fight was over, as I was going to town after the doctor, overtook and passed Jim Talbot, on horseback, in pursuit of defendant, up at the lake; defendant was dodging behind a tree and Jim Talbot near by with his gun, and being after a doctor, rode on, and as I went, heard a gun fire.

Henry R. Payne, a witness for defendant, says: He lives near the mill; on the day of the killing went to Gallatin; while there heard of it, and returned, and went to the mill where deceased was killed; was on the inquest; discharged about midnight, and went by to see defendant on my way home; he seemed to be in much agony; was bruised on back and shoulders and shot in the side; Murray was there; Murray followed me out and asked me what ought to be done with defendant; I replied by asking him some questions; he replied defendant ought to be hung; I told him there was a law to try him; was at mill next day; talked to Talbot, but did not see or converse with Murray that day; nothing said to me on Tuesday about mobbing defendant; on Wednesday evening, Mr. Emery came to my house and said something that induced me to believe there was a mob; after that I immediately started to Packwood's; on the way was overtaken by Charley Poole, who handed me a letter

soliciting me to come to Talbot's that night to join a mob to hang defendant; I refused to have any thing to do with it, and told defendant what I had learned about the mob, and that they were coming that night to hang him, as I had heard; the old man's daughter went out and got a corn knife and some other weapons of defence; I left soon and went home; never advised the mob with anybody; did not see or converse with Morrow on Tuesday at the mill; there was a notice stuck up lately threatening witness about testifying in this cause; says that Thomas Blakely was at defendant's, covered up in the bed, on Monday night.

David Enyart, for defendant, says: That he heard Henson Bennet say (on Monday of Dougherty's death) something ought to be done; he was speaking about the killing of Dougherty by defendant; said that I was the kind of a man to take hold of the matter—alluding, as I supposed, to the mob; Bennet made two or three efforts to approach witness on subject of mob; understanding what he was after, I avoided him and only listened to him, not giving an opinion myself; after he had approached me and being repulsed, I saw him go and converse with two or three other men; and then he returned and tried to approach me again, but I repulsed him; Bennet was intoxicated at the time he talked to him in reference to mobbing defendant.

Dr. Estis, for defendant: Saw defendant some eight or ten days after the difficulty; examined bruises on his back; considered them severe bruises, but not dangerous; they extended from the neck to middle of back; back appeared generally bruised;. think it likely the flow of blood from the mouth was produced by the gun-shot wound rather than the beating, as it was the greater shock; gun-shot wound did not enter the cavity and injure the ribs.

Dr. Kelly, for defendant, says: That from the evidence in the case, and from what he had seen in person of defendant, it is his opinion the hemorrhage was from the lungs, and attributable to the beating and not from the gun-shot; there

is also a shrinking of the muscles on the shoulders of defendant, which he thinks is also attributable to the beating.

Nathan Snyder, a witness for the defendant, being re-introduced, says: That he told Wickiser if Packwood did not take back or disavow the scurrilous notice about him, he would kill him or be killed.

Hobbs, a witness for State, says: That Rader had about him at the time of the difficulty with Nath. Snyder, a scabbard knife, some four or five inches long, which he generally kept at witness' house.

W. A. Morrow, a witness for State, says: That he was at Talbot's the day after Dougherty was killed; heard old man Payne in a conversation with Murray, and remark it was well for defendant that the killing had not taken place in Clay, or Platte, or Boone, but said nothing about hanging; did not hear [what] old man Payne said, but heard him say that it (whether the killing or mobbing witness can not state) was a disgrace to the neighborhood, which had always heretofore been a good neighborhood.

This was all the evidence given in the cause.

The court, at the instance of the prosecution, instructed the jury as follows: " 1. If the jury believe from the evidence that the defendant, Larkin Packwood, wilfully, deliberately, premeditatedly and of his malice aforethought killed John T. Dougherty, as charged in the indictment, they will find him guilty of murder in the first degree. 2. The declaration and premeditation necessary to constitute murder in the first degree only requires that the killing should have been determined upon before the fatal blow was given, and that the intention to kill existed in the mind prior to striking the fatal blow. 3. That if the jury believe from the evidence that the defendant went to the house or mill of deceased and one T. S. Talbot with the intention of provoking a difficulty with the deceased in order that he might take the life of deceased, John T. Dougherty, and that he did provoke a difficulty with the deceased pursuant to such intention, which

resulted in the death of Dougherty, they will find him guilty although they should believe that the deceased, Dougherty, committed the first assault.   4. That the jury may find the defendant guilty of murder in the first or second degrees, or any of the degrees of manslaughter, if the evidence justifies or requires such finding."

The court, at the instance of defendant, instructed the jury as follows : " 1. If the jury believe from the evidence that defendant killed deceased in the defence of himself, when he had reasonable cause to apprehend a design on the part of deceased to kill him or do him some great personal injury, and there was reasonable cause on his part to apprehend immediate danger of such design being accomplished, then the killing was justifiable and they will find defendant not guilty, and that in that event they will so find, notwithstanding defendant may have, prior to that time, made threats against deceased.   2. That if there had been an old grudge on part of defendant towards deceased, yet if he did this killing in defence of himself and in resisting an attempt on part of deceased to kill him or do him great bodily harm, or where there was reasonable cause on part of defendant to apprehend a design on the part of deceased to kill him or do him some great . personal injury, and there was reasonable cause to apprehend immediate danger of such design being accomplished, then the law presumes said killing to have been in consequence of the recent attempt or design on part of deceased and not on account of the old grudge, in absence of proof to the contrary, and it devolves upon the State in such case to prove the killing to have been in pursuance of the old grudge and not on account of the recent attempt or design. 3. That it is the province of the jury to determine the weight and credit to be given to the testimony of any witness, and that they may reject and discard from their consideration the testimony or any part thereof of any witness, if they believe such witness is not worthy of belief or has not told the truth. 4. If the jury find from the evidence that the house near the mill was in the possession and under the control of Jacob

Snyder, then the defendant had a right to enter such house in a peaceable manner, with the permission of Snyder; and if Snyder made no objection to his entering it, the law will presume his permission to enter it. If, however, the said house was in the possession and under the control of the deceased and Thornton S. Talbot, then the defendant had no right to enter the said house against the objection of deceased and Talbot. But if the said house was in the possession of deceased and Talbot, and the defendant entered the said house against the objection of deceased, the deceased had no right to use force to expel him without first requesting him to leave, and giving reasonable time for the defendant to leave. 5. That, in this case, the law presumes the defendant to be innocent, and it devolves on the State to prove him guilty, and that beyond a reasonable doubt."

The jury, by their verdict, found the defendant guilty of murder in the first degree. The defendant moved the court for a new trial and also in arrest of judgment. Both motions were overruled. Defendant duly excepted to the ruling of these motions. No exceptions were saved to rulings of the court during the trial.

*Gardenhire* and *King*, for appellant.

I. The court below erred in giving the third instruction asked for the State. There was no evidence whatever tending to show that the prisoner went to the mill or to Snyder's with the intent to provoke a difficulty, or that he did provoke it. On the contrary the whole evidence of the State absolutely excludes any such idea. This was the fatal instruction upon which the prisoner was convicted, and manifestly misled the jury.

II. In criminal cases—especially in a case affecting human life, where the verdict is manifestly against the evidence, or where it preponderates so strongly as to strike the mind at once as a conclusion contrary to the truth, or as originating in a popular prejudice against which the best ordered communities are not always secure—the obligation to order a new

trial is imperative. (State v. Sims, 2 Bailey, 29; McClure v. Cain, 2 Robinson, 790 ; Copeland v. The State, 7 Hump. 479 ; State v. Cruise, 16 Mo. 393, 394.)

III. The record manifestly shows a case of self-defence. It is sufficient to reverse the case that it is not murder. There can be no pretence that it is even manslaughter. The true criterion between chance-medley and manslaughter is said to be this: when both parties are actually combatting at the time the mortal stroke is given, the slayer is guilty of man-slaughter ; but if the slayer has not begun to fight, or (hav-ing begun) endeavors to decline any further struggle, and afterwards being closely pressed by his antagonist, kills him to avoid his own destruction, this is homicide excusable by self-defence. (4 Black. Com. 184; 1 Russell on Crimes, 661.) The prisoner not only did not provoke or begin the fight, but fled from forty to eighty yards, as far as he safely might. But the State relies upon some *verbal admissions* made by the prisoner before and after the homicide. There are several considerations connected with these admissions important to be noticed. If these statements were detailed by unprejudiced witnesses, they would be *received with great caution.* They consist in the mere repetition of oral state-ments, subject to much imperfection and mistake ; the party himself, it may be, not having clearly expressed his own meaning, or the witness having misunderstood. It frequently happens also that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actu-ally did say. (1 Greenl. Ev. sec. 200.) But the statements were not detailed by unprejudiced witnesses. They were forced to swear upon the trial that they were willing to mob and hang the prisoner. This ought greatly to increase the caution with which their statements are received. The cau-tion ought certainly to be *very* great. These men having been willing to mob and hang the prisoner, would they not be willing to take their places in the witness box and murder him by their oaths ? They were dangerous and most unre-

liable witnesses, and their statements never ought to be allowed to affect human life, unless corroborated by other testimony. They are not so corroborated. The conduct of the prisoner, at every meeting between him and deceased shown in the record, was utterly inconsistent with the statement of these witnesses. Never by word or deed did he seek a difficulty. On the contrary, he uniformly avoided it, submitting to rude behavior and opprobrious language from the deceased, without the slightest resentment. This was especially so at the time of the fatal conflict. There is no word or act of the prisoner, in the presence of the deceased, which can by any ingenuity be tortured into provocation. The whole conduct of the prisoner, in all his meetings with deceased, flatly contradicts the statements which murderous witnesses state he made before and after the homicide. Now, if the prisoner had, at the time of the fatal meeting, said any thing or did any thing to provoke deceased to assail him, his conduct might have been connected with previous threats and subsequent admissions. But nothing of the kind occurred. There is no room for plausible pretence. It is simply out of the question. But if prisoner's threats had been sufficiently proved, the prisoner, at the fatal meeting, having said or done nothing to provoke a difficulty, and having fled as far as he safely could, certainly had the right to defend himself. Previous threats could not take away the right of self-defence. They might awaken a closer scrutiny of the prisoner's conduct, but certainly they could not amount to a forfeiture of his life to the deceased. As to the statements of prisoner subsequent to the homicide, a member of his family says he did not make them. Her devotion to her father will certainly bear contrasting with the wicked and murderous feelings of the State's witnesses against him. Besides, her statement is fully corroborated by her father's condition, when it is said he made those statements—a condition proven by other testimony than hers—even by the State's witnesses themselves. He was expected to die; and his *special friends*, Hale and Murray, were there to help lay

him out if he did. What conversation for such an occasion! If so plain a case were susceptible of illustration it might be done by supposition. Suppose the deceased had killed the prisoner just before he turned with his knife, what would he have been guilty of? Murder; beyond all question, murder. This simple supposition unanswerably illustrates the character of the prisoner's act. The truth is, the verdict in this case was manifestly prompted not by the evidence, but by popular prejudice; and every consideration of law, human and divine, of popular government and humanity, requires the absolute and unconditional reversal of the case, and upon the ground that the prisoner acted in self-defence. The wild and reckless prejudices of the populace in this case ought to be promptly, firmly and decisively met by the court, and a human life not allowed to be sacrificed to the unauthorized cry for blood.

*Ewing*, (attorney general,) for the State.

I. No exceptions being taken during the progress of the trial, the only question, if any, which can be considered by this court is, whether there was evidence from which the jury might have found defendant guilty.

II. The evidence fully sustains the verdict. There is no real conflict in the testimony given on the part of the State as to the confessional statement of defendant. But if there is, it is the peculiar province of the jury to decide, and this is an additional reason why the verdict should not be disturbed. It was the province of the jury in considering the confessional statement of defendant to reject that part most favorable to him, if they believed it was improbable, contradicted by other evidence stronger than itself, or was less consistent with the whole transaction or a material part thereof than the other part, and to credit the part least favorable to his defence. (1 Greenl. Ev. p. 326.) Where provocation is sought by the prisoner and induced by his own act in order to afford him a pretence for wreaking his malice, it will be in no case of any avail. (1 East. P. C. ch. 5, 523, p.

239.) Before the law of necessity can exist, a *case* of necessity must exist. The slayer himself must be faultless ; he must owe no duty to the deceased ; be under no obligation of law to make his own safety a secondary object, otherwise he is answerable to the law of the land without any immunity under the shield of necessity. (Hays v. State, 17 Geo. 484.) A bare fear of the injury, to prevent which the homicide is committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that the party killing acted under the influence of these fears and not in the spirit of revenge. (Ib. 484.) The law requires that the person who kills another in his own defence should have retreated as far as he could to avoid the violence of the assault, before he turn upon his assailant, and that not fictitiously or in order to watch his opportunity, but from real tenderness of shedding blood. For in no case will a retreat avail if it be feigned in order to get an opportunity. (1 Hale, 481-2-3 ; Foster, 277 ; 4 Black. 185 ; Roscoe Cr. Ev. p. 661.) The characteristic ingredient in the offence of murder in the first degree is, the existence of a specific intention to take life ; and if that intention be deliberately formed and acted upon and death ensue, the intervention of provocation between the formation of the purpose to take life and the slaying will not reduce the offence below the grade of murder. (Clark v. State, 8 Humph. 671.) When a deliberate purpose to kill is ascertained, and there is a consequent unlawful act of killing, the provocation, whatever it may be, which immediately precedes the act, is to be thrown out of the case, and goes for nothing, unless it can be shown that this purpose was abandoned before the act was done. (State v. Johnson, 1 Ired. 354.) This court has laid down the rule which is sustained by authority and principle, that it will not disturb the verdict of a jury unless *manifest injustice* and wrong have been done ; nor will it control the discretion of the court below in relation to new trials. (State v. Cruise, 16 Mo. 611 ; Mc-Whett's case, 3 Gratt. 611 ; Hill's case, 2 Gratt. —— ; Mc-

Cune's case, 2 Robinson, 790–1; Varder's case, 12 Gratt. 727–8–9; Roberts v. State, 3 Kelly, Geo., 322–3; 1 Kelly, 618; Gills v. State, 6 Geo. 286; Alfred v. State, ib. 485; Com. v. Snelling, 4 Binn, 379; Kirbey v. State, 3 Humph. 289, 304; 2 Eng. Rep. 174; Walter v. State, 4 Pike, 87.)

NAPTON, Judge, delivered the opinion of the court.

It is not the province of this court to weigh evidence, nor has it been the practice to interfere with that discretion which has been entrusted to circuit judges over the verdicts of juries. I am not aware, however, that the court has in any case entirely repudiated all power over the subject, although I believe the tendency of recent decisions has been in that direction. Without undertaking to define the precise limits within which this power may be exercised, we are constrained to say that the verdict in this case is unsupported by the evidence, and can not be allowed to stand.

The facts were, that the deceased went to the house of one of his tenants, where he accidentally learned the prisoner was, with the intention of beating him with a stick, which he had picked up before he started; that he ordered the prisoner to leave, which order the prisoner immediately set about to obey by starting away through a door opposite to where the deceased stood with his stick or club; that he then commanded the prisoner to turn and pass through the door where the deceased stood, and the prisoner did so, and as he passed through, the deceased commenced striking him, the prisoner moving off rapidly; that the deceased followed the prisoner as he ran, all the time inflicting heavy blows upon him, and continued to beat him for from forty to eighty yards, when the prisoner turned and inflicted a single blow with a knife which proved fatal. The prisoner continued running and was shot in the back or side by a brother-in-law of the deceased, who, together with his father, had accompanied the deceased when he started to attack the prisoner. There was

evidence of threats before and acknowledgements of malice after the affray; but it is apparent, without any comments upon the details of the testimony, that this was not a case of murder in the first degree.

The third instruction was not warranted by any testimony in the case, and should not have been given. We have been unable, after a very careful examination of the bill of exceptions, to discover any evidence whatever that the prisoner went to the house of the deceased's tenant with the intention of provoking a difficulty; much less that he did provoke a difficulty after he got there. On the contrary, the witnesses for the State are positive and clear and uncontradicted that the prisoner neither used any language or did any act, or in any way whatever, actively or passively, so conducted himself as to provoke a difficulty.

In a case of this importance, where human life is at stake, we feel it to be an imperative duty to interfere. A bare perusal of the evidence will make it apparent that the State did not make out the crime of which the prisoner was charged and convicted, and that in truth no testimony was given which could reasonably lead to such a conviction.

We shall therefore reverse the judgment and order a new trial. Judge Richardson concurring.; Judge Scott dissenting.