STATE of Missouri, Respondent,

v.

**Billie Maxine WOOD, Appellant.**

**No. KCD 27597.**

Missouri Court of Appeals,
Kansas City District.

Nov. 3, 1975.

Motion for Rehearing and/or Transfer
Denied Dec. 8, 1975.

Application for Rehearing Denied
Feb. 9, 1976.

John W. Inglish, Carson, Inglish, Monaco & Coil, Jefferson City, for appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, for respondent.

Before SWOFFORD, P. J., and WELBORN and HIGGINS, Special Judges.

ANDREW JACKSON HIGGINS, Special Judge.

Billie Maxine Wood, charged with murder, second degree, was convicted by a jury of manslaughter and her punishment was assessed at a fine of $500. Sentence and judgment were rendered accordingly. §§ 559.020, 559.070, 559.140, RSMo 1969, V.A.M.S.

The facts are stated by quotation from appellant's brief:

"Hershel Wood, the husband of the defendant, Billie Maxine Wood, * * * was in the service station business at Osage Beach, Missouri, in conjunction with which he operated a wrecker service. When he accumulated too many cars at the station, he would tow some to his home. The deceased, Paul Franklin Byrd, had wrecked his 1965 Ford Econoline Van on July 29, 1972, at which time it was towed to Hershel Wood's station and, sometime later, to Mr. Wood's home.

"On October 7, 1972, at about 10:00 or 11:00 a.m., the deceased and his brother, Daniel Max Byrd (Danny), went to the Wood home for the purpose of getting the Van. * * * Upon arrival at the Wood home, both the deceased and his brother got out of the car and the deceased went to the door of the house and knocked. Defendant and her daughter, Marilyn Sue Golden, were in the dining room drinking coffee. Defendant looked out the picture window and saw the deceased approaching. The deceased, a very large man, had long hair and a black beard. His appearance frightened defendant. She expressed her fear to her daughter and asked her to go to the door, but she went herself. The deceased told defendant he had come for the Van and she said she would have to call the station to see what the charges were

against it. Defendant called her husband who said he would have to call the Shell station because he had written it down there and he would have to find out how many days storage to charge. Meanwhile, deceased and his brother had gone down toward the Van. Defendant then tried to call her son, Larry, who lived within walking distance of the Wood home, but the line was busy. She then sent Larry's six or seven year old son to get him. Defendant looked out the window and saw that deceased and his brother were hooking up the Van. She called Larry again, got through this time, and told him to 'get out here fast.' In the three or four minutes it took Larry to get there, defendant's husband had called back and told her the charge on the Van was $95.00. Defendant told Larry the charge was $95.00 on the Van.

"In the meanwhile, deceased and his brother, Danny, had backed his car up to the Van, opened the trunk of their car, taken out the tow bar and were in the process of hooking it up when Larry came down to where they were. On Larry's approach, deceased and his brother stood up and Larry said 'You better pay before you hook that up.' Deceased said, 'Pay what?' Larry said, 'For towing and storage.' Deceased asked, 'How much?' Larry said '$90.00' or '$95.00.' Deceased said, 'What for, just for a 5-mile towing bill?' and went back to work on the tow bar.

"At this point, there is a discrepancy in the testimony. Deceased's brother, Danny, testified that Larry took a tire tool out of the trunk of their car and swung at deceased, while Larry testified that after he had told them a couple of times to leave the Van there until he had paid the bill, deceased 'jumped' him. Larry also testified that he did not have anything in his hand at the time, but picked the tire tool up after deceased got off him. According to Danny's version, deceased grabbed Larry's arm that had the lug wrench in it and they started 'wrestling around' while, according to Larry, he was trying to get away from

deceased when he fell over the car and that is when deceased pinned him down.

"Danny also testified that deceased may have had his hand on the lug wrench but, if so, it was in the process of trying to get it away from Larry. He testified that he, Danny, never touched it. Danny also testified that at this point, Larry was trying to get away from deceased and deceased was trying to keep him from getting away so he wouldn't hit him. * * *

"Deceased was on top of Larry on the trunk or hood of a car. Larry was kicking so Danny grabbed Larry's feet or ankles. According to Danny, Larry was helpless. Deceased had hold of Larry's right hand with his left hand because Larry had the lug wrench in his right hand, but he couldn't see what deceased was doing with his right hand. According to Larry, deceased was hitting him and choking him with both hands on his throat and Larry had nothing in his hand. Defendant then heard voices, looked out and saw the fight. She screamed and ran toward the bedroom, and got a pistol. Defendant's daughter ran out of the house through the yard, picked up a Pepsi bottle and screamed at deceased and his brother to let Larry go. Deceased just looked back at her and raised his foot like he was going to kick her, but did not stop. She testified that deceased had his hands around Larry's neck. She could not see Larry's hand, but did not see a lug wrench. Defendant testified that when she got there, deceased was choking Larry, 'had his hands around his neck and his face was blood red and tears was in his eyes and he took—I knew he couldn't say nothing, but he was looking right at me.' She was screaming and when she got a few feet away, she told the deceased twice to turn Larry loose, but he wouldn't. She then shot the pistol in the air twice. Danny testified there were no warning shots. Danny turned loose of Larry and left, but deceased 'just kinda raised up' and said 'God damn' but did not turn loose of Larry. Defendant then pointed the pistol toward deceased and Larry and fired. Deceased then said, 'She shot me,' and turned loose of Larry. * * Deceased then got off Larry and defendant could see Larry's hands, but she didn't see a lug wrench. According to Danny, Larry still had the lug wrench in his hand. Defendant then, at Larry's request, gave him the gun. An altercation then followed between defendant's daughter and Danny who was trying to get into the house to call a doctor, and Danny was hit over the head with the lug wrench by Larry. According to Danny, defendant said, 'Give me the gun and I will kill him, too.' Larry's testimony was that he picked up the lug wrench when he went to the defense of his sister while Danny testified that Larry had the wrench in his hand all the time. Danny and deceased left in their car, went to a doctor at Lake Ozark, thence to another doctor in Eldon who pronounced Paul Byrd, the deceased, dead."

The court gave, among others, MAI–CR 2.40 on the defense of justifiable homicide in lawful defense of one's child, MAI–CR 6.06 on murder, second degree, and MAI–CR 6.08 on manslaughter.

Appellant charges the court erred in instructing the jury on the issue of manslaughter "because there was no evidence to warrant such an instruction." She argues that defendant was acting in defense of her son and if the jury found that in doing so she acted reasonably and within the standards of Section 559.040, RSMo 1969, V.A.M.S., defining justifiable homicide, she was justified in her actions and should have been acquitted; that conversely, if she was not justified, she should have been convicted of murder, second degree; that there was no evidence of and no contention on her part that she was acting in the "heat of passion" or under "lawful provocation," but by instructing on manslaughter, the court permitted the jury to convict her of an offense which the facts did not support.

Appellant supports her argument with a detailed history of the case law and comments on manslaughter at common law and in Missouri, including, among others, *State*

v. Gore, 292 Mo. 173, 237 S.W. 993 (1922); State v. Williams, 442 S.W.2d 61 (Mo. banc 1968); State v. Ryan, 492 S.W.2d 116 (Mo. App.1973); State v. Bird, 286 Mo. 593, 228 S.W. 751 (1921); State v. Smith, 518 S.W.2d 665 (Mo.App.1975); State v. Ayers, 470 S.W.2d 534 (Mo. banc 1971); State v. Amerson, 518 S.W.2d 29 (Mo.1975); State v. Patterson, 484 S.W.2d 278 (Mo.1972); State v. Packwood, 26 Mo. 340 (1858); State v. Kelsay, 228 S.W. 754 (Mo.1921); State v. Hollingsworth, 156 Mo. 178, 56 S.W. 1087 (1900); State v. Stapleton, 518 S.W.2d 292 (Mo. banc 1975); The Missouri Bar Committee Comments on Missouri Approved Criminal Instructions, Manslaughter, p. 8, John Scurlock; 27 Mo.L.Rev. 1 (1962), Criminal Law in Missouri—Manslaughter, A Problem of Definition, Edward H. Hunvald, Jr.

Appellant recognizes that her position is "flying in the face of the latest decision of the Supreme Court of Missouri on this subject," but urges "this Court as the one having jurisdiction of this appeal to reconsider the whole subject of homicide and return it to a posture more logical than that in which it now finds itself."

Appellant's position and invitation are fraught with several difficulties:

■ First, it is the constitutional duty of this court to follow the last controlling decisions of the supreme court. Art. V, § 2, Const. of Missouri, 1945. In this respect, "the trial court is required to submit manslaughter in murder second degree cases on the basis of the evidence which supports the second degree murder instruction even though there is no evidence of lack of malice or premeditation—no evidence of provocation." State v. Stapleton, supra, 518 S.W.2d l.c. 300[5].[1]

■ Second, with respect to the invitation "to reconsider the whole subject," it is noted that the supreme court by order, September 25, 1975, effective September 28, 1975, applicable to trials of offenses committed on or after September 28, 1975, has

reiterated its position in State v. Stapleton, supra, directing that "the court must give an instruction on manslaughter (MAI–CR 6.08) in all cases where any higher homicide offense, conventional or felony murder, is submitted to the jury. This follows from the nature of manslaughter." See special direction 2 as to the submission of lesser graded or necessarily included homicides under Note on Use 4, MAI–CR 6.02, 9–25–75, effective 9–28–75.

Third, the foregoing propositions are consistent with Rule 26.06, V.A.M.R., that "a defendant * * * shall have no just cause for complaint because * * * the evidence showed or tended to show him to be guilty of a higher degree of the offense than that of which he was convicted"; and Section 556.220, RSMo 1969, V.A.M.S., that "Upon indictment for any offense consisting of different degrees, * * * the jury may find the accused not guilty of the offense charged * * *, and may find him guilty of any degree of such offense inferior to that charged * * *; and any person found guilty of murder in the second degree, or of any degree of manslaughter, shall be punished according to the verdict of the jury, although the evidence * * * shows him to be guilty of a higher degree of homicide."

Judgment affirmed.

All concur.

---

1. State v. Stapleton, supra, decided a case tried prior to January 1, 1972.