THE STATE v. JAEGER, *Appellant.*

1. **Assault to Commit Rape.** An indictment under section 32, p. 449, Wag. Stat., for an assault with intent to commit a rape upon a female child under the age of twelve years, need not contain the word "ravish."

2. **A verdict set aside as against the evidence.** While the Supreme Court will not lightly interfere with the verdict of a jury even in a criminal case, yet when it owes its birth and being to prejudice rather than to evidence, the court will refuse to sanction it.
   In the present case the court, after examining the evidence in detail, sets aside the verdict and reverses the judgment of conviction.

3. **Declarations by a Wife,** NOT EVIDENCE AGAINST HER HUSBAND. A proposal to have a criminal charge hushed up made by the wife of the accused, in his absence, is not admissible in evidence against him upon a trial for the alleged offense.

*Appeal from St. Francois Circuit Court.*—HON. LOUIS F. DIN-NING, Judge.

*John F. Bush* and *F. & E. L. Gottschalk* for appellant.

1. The indictment is insufficient. *State v. Mitchell,* 25 Mo. 420; *State v. Ball,* 27 Mo. 324; *State v. Byron,* 20 Mo. 210; *State v. Fulton,* 19 Mo. 680; *State v. Ross,* 25 Mo. 426; *Spratt v. State,* 8 Mo. 247.

2.   The verdict is not supported by the evidence, and the judgment should be reversed for this reason.   *State v. Fritchler*, 54 Mo. 424.

3.   The proposal of Mrs. Jaeger to have the matter hushed up, should not have been given in evidence ; 1st, because it was mere hearsay ; 2nd, because a wife's declarations are inadmissible against her husband, on the same grounds of domestic policy, which make her testimony against him inadmissible.   Roscoe Crim. Ev., (Am. Ed.,) 113; 1 Phil. on Ev., 96; *Burgen v. Tribble*, 2 Dana 383; *Smith v. Scudder*, 11 Serg. & R. 325 ; *Park v. Hopkins*, 2 Bailey 408 ; *Comm. v. Briggs*, 5 Pick. 429.

*J. L. Smith*, Attorney-General, for the State.

1.   The indictment is certainly good.   Wag. Stat., p. 449, § 32 ; p. 448, § 23.

2.   The evidence as to Mrs. Jaeger's proposal could not be excluded because of the rule in reference to compromises, as the rule does not apply to criminal prosecution—only to civil ones.   It was not hearsay, as the wife herself being inadmissible as a witness, there could be no other mode of proving the conversation.   If it was irrelevant, it did the defendant no harm.   And, again, the conversation between the wife of defendant and the mother of the child, was brought out by defendant himself, and the plaintiff was pursuing a legitimate cross-examination when he elicited the matters of which defendant now complains. Even if the evidence was incompetent, still this court will not reverse therefor, as the evidence proved nothing, and could not have produced a different verdict.   *Clark v. People*, 31 Ill. 479.

3.   This court will not interfere with verdicts in criminal cases, unless the evidence is so strong against the verdict as to show that it is manifestly wrong and unjust. *State v. Connell*, 49 Mo. 282.

4.   To disturb the verdict for want of evidence the

failure must be so great as to leave the necessary inference that the jury acted from prejudice or partiality. *State v. Cook*, 58 Mo. 546

*F. M. Carter*, Prosecuting Attorney of St. Francois county, also for the State.

The evidence on the re-examination in chief as to the conversation between the mother of the injured party and wife of defendant, as to a proposition to compromise, made by the latter to the former, was elicited in explanation of a question asked by defendant, as to whether the mother of the girl did, or did not, propose to compromise the alleged offense for the sum of one thousand dollars, and was a part of the conversation in which the thousand dollars was mentioned, and was first drawn out by defendant's counsel, and under the circumstances could not prejudice the rights of the defendant, but it was necessary that such conversation in relation to the alleged offer of compromise should be fully detailed to the jury in order that they might fully understand the issues.

SHERWOOD, C. J.—The defendant indicted, tried and convicted, under section 32, (p. 449, 1 W. S.,) for an assault upon a little girl between 9 and 10 years of age, with intent, &c., and sentenced to imprisonment in the county jail for six months, and to the payment of a fine of $500, appeals to this court.

Under the authority of *McComas v. The State*, (11 Mo. 117), we must hold the indictment, although not containing the word " ravish," sufficient. Thus, conceding the sufficiency of the indictment we are led to the trial and the incidents.

It is, indeed, a very sad commentary on human nature, that accusations like the present, are ever founded in fact; and it is an equally melancholy reflection that but too frequently, charges of this sort result alone from the promptings of a mendacious and malevolent spirit fortuit-

ously furnished with some slight circumstance sufficing to give verisimilitude to some artfully woven and damning story. The judicial annals abound with instances where the sheerest fabrications respecting the offense here charged, have been made to assume and wear the hue and complexion of absolute verity. Courts and juries, hurried away by the mere atrocity of the charge and heinousness of the alleged crime, forget, in what they verily regard as a just indignation, to patiently observe those prudent precautions, in weighing and scrutinizing the testimony adduced in support of the grievous charge, in the manner tested and approved in investigations of this nature, by the wisdom of ages. In this connection the warning of Lord Hale, respecting the consummated crime, should be borne in perpetual remembrance, as equally pertinent regarding assaults with intent to commit the crime : " that it is an accusation easily made, hard to be proved, and still harder to be defended by one ever so innocent."

The assault is said to have occurred in a bakery, almost at the hour of high noon, on a frequented street of a town possessing a population of some five hundred inhabitants, augmented by a force of laborers employed at a " cut," but a few minutes walk from the scene of the alleged offense. The child relates that on the morning of the alleged occurrence, her mother sent her to defendant's bakery for bread; that upon making her errand known, instead of complying with her request, he got up, locked the front door, seized her by the hand, took indecent liberties with, and made improper proposals to her, dragged her behind the counter, threw her on the floor, exposed his person and made the assault with which he is charged, but upon her crying, he asked her if she did so because the floor was hard for her head, and if she wanted a pillow; got up, told the child to stay till he came back; went through a side door through the back shop to the front door of the dwelling house, which door was some twenty yards distant, went up stairs where the boarders slept, got the pillow, and

was returning with it, when, having seized the bread (three loaves, which she says she bought, although defendant never, gave it to her, and which she says was not on the table when she went in, and which she says defendant never put there prior to taking her behind the counter) she unbolted the front door and went out to the yard gate, just as defendant returned through the back door with a gray pillow, opened the door, looked behind the counter, and exclaimed with an oath, " She's gone !" She also states, and reiterates the statement, that she was at the bakery two hours; that Jaeger was not gone for the pillow more than a minute; that she ran home, reached there as the whistle blew, and told her mother what had happened.

Aside from the intrinsic improbability of this story, that a brutal assault would have been discontinued on so slight and singular a pretext, there are greater obstacles still to be overcome, before the story of the child can be believed. She is flatly contradicted by Margaret Kober, who states she saw the child, on the morning in question, come into the bakery, buy bread of Jaeger, and go out of the yard gate ; that witness was cooking for defendant's family, and went into the bakery four times that morning, the last time to get bread and to call defendant to dinner, at which time witness saw the child come into the gate, and into the front door, as witness came into the back door, and when witness went behind the counter where Jaeger was, she heard the child ask him for bread; which, when he had given her, he, in a moment thereafter, came out to dinner, and that this was but a few minutes before 12 o'clock, as shortly thereafter, the whistle blew. In addition to that, if the diagram furnished by the witness Thompson be correct, it was physically impossible for the child, standing at the yard gate, to see Jaeger look behind the counter, and immediately on coming into the back door he would have seen the front door open, and had no necessity for looking behind the counter. The child also testifies that the back door of the bakery, the one leading

into the bake-shop, was shut that morning; in this, she is contradicted by Bluton, who was the baker of the defendant, and remained in the bake-shop all the morning, except when a few moments absent, about ten minutes before the whistle blew, seated on a bench in front of the dwelling house—which was separated from the bake-shop by a space of some ten feet—and that Bluton was seated on the bench at the time just stated, is shown by the testimony of Lucius—who, driving up to the dwelling house on some errand, saw Bluton there, and saw Jaeger also, who came out of the dwelling house, received the message, and sold witness a pie. The message to Jaeger required the taking of bread by him to Bismarck that afternoon; and he went there with Margaret Kober, that afternoon, as shown directly by her testimony, and indirectly by that of Mrs. Wahl, the child's mother. This portion of the testimony relating to the trip to Bismarck, is only important, as identifying the day. Nor are these all the impediments in the way of giving credence to the child's story. Gertrude Brandt, another servant of defendant, was washing clothes all day, and especially from 8 o'clock in the morning until 12 o'clock, in the narrow alley between the bake-shop and the dwelling house, about twenty feet from the door of the dwelling house, which fronted the back door of the bake-shop, and only some twenty-one feet from the south end of the counter, behind which the assault is said to have occurred. And that Gertrude Brandt was washing in the yard that day, and shortly after the alleged assault, is shown by Mrs. Wahl's own testimony. Besides, Mrs. Jaeger, having a sore foot, was seated in the dwelling house door, which fronted the back door of the bake-shop, knitting all the time between the hours of 11 and 12 o'clock, on the morning the assault is said to have occurred. This is shown by the testimony of Margaret Kober and of Gertrude Brandt, whose washtub faced that door; and that she was washing there that day is corroborated by Margaret Kober's testimony, which also confirms that of Lucius

as to seeing Bluton seated on the bench at the time indicated. Nor is this all; it is shown by Gertrude Brandt that Jaeger's five children, the oldest some 18 years of age, were all at home that day, and by Margaret Kober, whose duties as cook required attention to the time, that the family usually sat down to dinner at fifteen minutes to 12 o'clock, and the family were still at the table when 12 o'clock arrived or the whistle blew. The child is also contradicted by both Gertrude Brandt and Margaret Kober, as to Mrs. Jaeger being seated in the dwelling house door, facing the back door of the bake-shop. She also contradicts and is contradicted by her own mother; the former swearing that a conversation occurred the previous night as to what she was to swear at the trial; the mother swearing exactly the reverse.

In addition to that, the animus of the mother toward the defendant, is shown by her saying, "that Jaeger had it too good," i. e., was too prosperous. And, if Christ. Hacke is to be believed, (and the prosecution did not succeed in its attack on his reputation) Mrs. Wahl, on the day of the preliminary examination, was heard threatening the child in case she failed to testify in a certain way. When we reflect on the foregoing circumstances, we are constrained to wonder that a jury could be found, who, regarding the defendant's guilt as established beyond a reasonable doubt, would find a verdict against him. And while this court, it is true, will not lightly interfere with the verdicts of juries, even in criminal cases; when such verdicts owe their birth and being to prejudice rather than to evidence, we will not fail to refuse our sanction to such unwarrantable results. (*State v. Packwood*, 26 Mo. 340 ; *State v. Burgdorf*, 53 Mo. 65; *State v. Mansfield*, 41 Mo. 470; *State v. Daubert*, 42 Mo. 238 ; *State v. Brosius*, 39 Mo. 534.)

So far as concerns the instructions given and refused, we have found nothing worthy of special comment, in view of the insufficiency of the evidence. There is, however, another point to which we desire to advert before closing

consideration of the case. It is this: Mrs. Wahl was allowed, against the objection of defendant, to testify in regard to his wife having called on her the morning following the alleged assault, and, in the absence of defendant, making proposals to have " the matter hushed up." Upon what principle or rule of evidence such statements were admitted, neither the horn-books of the profession, nor the reports of adjudged cases, furnish either illustration or example. It is growing excessively monotonous to have to reverse judgments in criminal cases for errors such as these; errors so palpable that it would really seem that the bestowal of even cursory attention on the rudimentary principles of evidence would effectually prevent. (*State v. Arnold*, 55 Mo 89.) And it will not do to say that the testimony was merely irrelevant, and consequently did the defendant no harm. It went to the jury against the objection of the defendant, accompanied by the express approval of the court; and no doubt it was received and regarded by the jury in the same light as if a direct proposal of compromise from the defendant himself. If the minds of the jury, at that juncture, were still tremulous with indecision between the innocence and the guilt of the prisoner, the reception of such testimony was sufficient to turn the scale against him. And the courts will hesitate long before they will say that the violation of a plain rule of evidence, as in the present instance, did not operate to the prejudice of the accused. (*State v. Holme*, 54 Mo. 160.)

For the error just mentioned, and for the failure to set aside the verdict, because of the insufficiency of the evidence, we reverse the judgment and remand the cause. All concur, except NAPTON, J., who expresses no opinion.

REVERSED.