SPIRO, Respondent, v. ST. LOUIS TRANSIT COMPANY, Appellant.

St. Louis Court of Appeals, November 3, 1903.

1. **Practice:** NEGLIGENCE: ACTS OF, MUST BE PROVED AS ALLEGED. The very acts of negligence must be proved, if specific acts are alleged.

2. ———: APPELLATE: VERDICT ON EVIDENCE CONTRARY TO NATURE. While it is fundamental that juries must weigh evidence and trial judges must revise their findings, and while the appellate courts are reluctant to disturb verdicts for insufficient evidence, yet a verdict rendered at the first trial, resting on evidence which looks contrary to the course of nature, may be set aside by the appellate court.

3. ———: SETTING ASIDE VERDICT WHICH SHOWS PARTISAN BIAS. In an action for damages resulting from a collision with a street car, a verdict for plaintiff on the first hearing will be set aside by the court of error, where the evidence for plaintiff was so improbable, according to the operation of physical forces, as to compel the conviction that the jury either failed to weigh the evidence or yielded to partisan bias.

Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher,* Judge.

REVERSED AND REMANDED.

*Boyle, Priest & Lehmann, Crawley, Jamison & Collet* and *Geo. W. Easley* for appellant.

(1) Such testimony as that given by the plaintiff's driver, in face of the evidence and the physical facts of the case, has no probative force, and does not raise a question of fact to be submitted to a jury. "It will be disregarded as testimony by the court." Hook

v. Railroad, 162 Mo. 581; Kelsey v. Railroad, 129 Mo. 362; Hayden v. Railroad, 124 Mo. 573; Payne v. Railroad, 136 Mo. 575; Baker v. Railroad, 122 Mo. 589; Gurley v. Railroad, 104 Mo. 211; Hickman v. Railroad, 47 Mo. App. 65; Weaver v. Railroad, 60 Mo. App. 210; Lien v. Railroad, 79 Mo. App. 480; Railroad v. Smith, 86 Fed. 296; Railroad v. Pounds, 82 Fed. 217. (2) The first instruction given for plaintiff is erroneous. It submits to the jury that the plaintiff's driver attempted to cross the track in close proximity to the car, and directs a verdict for the defendant, unless the car could be stopped after knowledge of the plaintiff's danger. There was no evidence offered by plaintiff of the ability of the motorman to stop the car. All of the evidence on that subject was to the effect that the car could not be stopped. Such an instruction should not have been given, under circumstances. Holwerson v. Railroad, 157 Mo. 226; Watson v. Railroad, 133 Mo. 25; Zurfluh v. Railroad, 46 Mo. App. 642; Hanselman v. Railroad, 88 Mo. App. 123. (3) The third instruction asked by the defendant should have been given. The instruction but asserts the rule announced in the many cases.

*John J. O'Connor* for respondent.

(1) Plaintiff's driver had as much right to use that portion of the public street covered by the defendant's tracks as did the defendant. Neither had any exclusive rights therein. Hutchinson v. Railroad, 88 Mo. App. 376; Moore v. St. Louis Transit Co., 95 Mo. App. 728; Edwards v. Railroad, 94 Mo. App. 41; Oates v. Railroad, 168 Mo. 535. (2) There was very strong evidence in support of every issue of fact required to be proven by the plaintiff, but even if such evidence was weak, this court would not weigh the evidence to determine on which side the preponderance lay; when there is evidence in support of both sides, the finding of the jury will be respected by this court. Reynolds v. Buffington, 75 Mo. App. 86; Hansan v. Russell, 75 Mo. App. 110; Downing v. Railroad, 70 Mo. App. 657. The de-

fendant's demurrer to the evidence was properly over-ruled.    Lamb v. Railroad, 147 Mo. 171.    (3)    The in-structions given, when all read together, clearly, fairly and fully set forth all the law of the case, and when this is done, all is done by the court required of it under the law.    Ridenhour v. Railroad, 102 Mo. 270; Fischer v. Edward Heitzberg Packing & P. Co., 77 Mo. App. 108.

## STATEMENT.

Plaintiff obtained a verdict for injuries to a horse, wagon and harness, caused by a collision with one of defendant's street cars, and defendant appealed.

Plaintiff conducts a dyeing and cleaning establish-ment in the city of St. Louis, and the damaged property was used to deliver packages.    On the day of the acci-dent it was in charge of Robert Hoppe, an employee of the plaintiff.    The accident occurred December 2, 1902, on Laclede avenue.    The driver, Hoppe, had stopped at the house numbered 4034 on the south side of that avenue to deliver a package.    After doing so he got into the wagon and resumed his westward course, first looking, he says, east and west for cars and seeing none.    His testimony is that he "slanted over" to the west-bound track and traveled straight along said track for about seventy-five feet, when the car struck the rear end of the wagon injuring him and the prop-erty.    The occurrence happened about ten o'clock in the forenoon.    The day was rainy but not so dark as to obscure clear vision.    Hoppe testified that he not only looked for cars in both directions, but was constantly watching from time to time as he drove on, until he was struck.    These observations he made by looking around the sides of his wagon and through windows in either side and in the back.    That portion of his testimony follows:

"Q.    Raining a little?    A.    It was raining hard.

"Q.    At the time you went out to get into the wagon you testified that you looked to see whether there was a car coming?    A.    Yes, sir.

"Q. You say you didn't see any car? A. No, sir; I didn't see any.

"Q. You got into the wagon and drove across to the north track? A. Yes, sir.

"Q. And turned into the north track? A. Yes, sir.

"Q. Now, then, did you look again to see a car? A. Yes, sir.

"Q. When did you look? A. I was looking all ways before I came—before I hit the north track; I look always for a car.

"Q. Until you got over into the north track? A. Yes, sir.

"Q. After you got on the north track and turned west, did you look any more for a car? A. Yes, sir.

"Q. When did you look next? A. As soon as I got in the track I was looking for a car, and I couldn't see the car; I never heard the bell, neither.

"Q. I am not talking about that. You looked for a car? A. Yes, sir.

"Q. When you turned into the track? A. Yes, sir.

"Q. That is the last time you looked? A. No, sir.

"Q. That was the last time you looked before you got hit? A. I was looking before I got hit.

"Q. Were you looking all the time you were driving along there? A. I was always looking; I was looking all the time.

"Q. You had a glass window at the rear end of the wagon? A. Yes, sir.

"Q. You had a glass window on each side of you? A. Yes, sir.

"Q. And your seat was extended out to the front; there was just a hood over the seat; it was so you could look around without any trouble? A. Yes, sir.

"Q. And were you looking constantly from the

time you drove onto that track until you were struck?
A. Yes, sir.

"Q. And you say you could see a car down the street to the east for some considerable distance? A. Well —

"Q. You could have seen it if it had been there to see? A. Yes, sir.

"Q. There was nothing to prevent you from seeing it? A. No, sir.

"Q. No obstruction? A. No, sir.

"Q. Nothing in the way? A. No, sir; there was nothing.

"Q. The darkness wasn't sufficient to prevent you from seeing an object the size of a car at least a block away or more? A. No, sir; well, that was a big block; from Vandeventer to Sarah is about two blocks.

"Q. And yet you say you didn't see that car and was looking for it all the time? A. Yes, sir; I do, sir, and the car was flying.

"By Mr. O'Connor: Q. After you got into the track and was driving west could you have seen the car then behind you? A. Yes, sir.

"Q. When you were in the wagon? A. No, sir; I didn't.

"By the Court: Q. Was your wagon a wagon with a box on it? A. Yes, sir.

"Q. Covered wagon? A. Yes, sir.

"Q. Frame or cloth? A. Frame.

"Q. And the only way you could see would be to see back through this window or around at the side of the wagon? A. I could see from the side and from the back, too; a glass is in behind.

"Q. You could look through the glass? A. Yes, sir."

Another witness for the plaintiff swore the view was unobstructed for about two blocks east and that he saw the car that far.

John Fahy corroborates Hoppe in some particulars. Fahy says he was standing near the house where the wagon stopped; that after a package was delivered, Hoppe drove the wagon on the north track and traveled about seventy-five feet due west when the collision occurred. This witness said there was no obstruction between the car and the wagon and not a thing to interfere with the view. Both these witnesses, while they agree the wagon and horse were traveling along the north track between the rails, the wheels of the wagon running in the rails, agree further with every other witness in the case to this paramount fact: that the blow of the car turned the wagon and horse around, so that the front end of the wagon and the head of the horse were facing straight to the east immediately after the collision; whereas before they had been moving directly west.

Here is Hoppe's narrative of the occurrence:

"Q. Were you thrown out of the wagon? A. No, sir.

"Q. You stayed in? A. Yes, sir.

"Q. The wagon was turned clean around? A. It turned the whole thing around; I had the lines in my hand.

"Q. How was the horse injured, if any? A. The horse was injured right on the hip, I think on the left side, I am not sure. In that accident where I was inside, I couldn't tell which way he was, but anyway it wasn't fit to work.

"Q. The car didn't strike the horse? A. The car struck just the wagon.

"Q. Just struck the wagon? A. Yes, sir.

"Q. And carried it around? A. Yes, sir.

"Q. The car didn't touch the horse at all? A. No, sir; I don't think it did.

"Q. So the injury the horse received was because of the wagon being knocked against it; that is the way the horse was injured, wasn't it? A. Well, the car

struck the wagon from behind and turned the whole thing around.

"Q. The car didn't touch the horse at all? A. No, sir.

"Q. I believe you said you were going west? A. Yes, sir.

"Q. You were going right straight down the track? A. Yes, sir.

"Q. When this car struck you it was running tolerably fast? A. Yes, sir; it was running fast.

"Q. And struck you right square behind? A. Yes, sir.

"Q. And it turned the wagon clear around and never touched the horse, or injured the horse, except as the wagon came in contact with it? A. No, sir.

"Q. The horse was turned around—was clear on the outside of the track? A. It was right around facing the east.

"Q. It was clear on the outside of the track? A. Yes, sir.

"Q. Looking east? A. Yes, sir.

"Q. He wasn't on the track at all; there was no part of the horse on the track at all? A. When I was struck by the car, the whole wagon and horse was struck.

"Q. He was right in the center of the track? A. Yes, sir.

"Q. You mean in between two rails? A. Yes, sir.

"Q. The horse was between the two rails and the wagon wheels were running on the rails? A. Yes, sir."

Other witnesses testified that instead of the wagon being struck in the rear, as it was moving along the north track, it was struck on the right side towards the rear as it was in the act of passing over the north track from the south one on which it had been traveling previously; in other words, that the horse and wagon had been traveling along the south track, and of course

in no danger from the car; but they suddenly deviated to the right and crossed to the north track when the car was but forty or fifty feet away, the result being that the horse got safely over, but the wagon was hit by the car near the rear end with such force that the back of the wagon was knocked to the west and the horse and shafts to the east. All the witnesses agree that this was the position of the horse and wagon immediately after the collision; that the wagon was turned over on its left side, while the horse was lying down in the shafts and, according to the expression of one witness, the vehicle and horse were "turned end for end."

Two disinterested men, and likewise the motorman and conductor, swore the accident happened because the horse and wagon suddenly turned on the north track from the south one, so that the front of the car collided with the rear of the right side of the wagon.

A. J. Madden narrated the occurrence as follows:

"I was sitting in the front end of the car, on the left hand side; and my first attention was called to it by the sudden stopping of the car; I looked up and the wagon was crossing the track. The horse had just about cleared it, and it all happened in an instant. The car hit the back of the wagon just a little back of the center and the wagon spun around. The horse fell to the north; and some of the passengers on the car, and the motorman and conductor, went back to it, unhitched the horse—helped unhitch the horse. There were several others came there and got it up. The conductor told the motorman—he told the motorman to go ahead with the car and the passengers got on and went out. I had a Taylor avenue transfer."

M. J. Henneke gave this testimony:

"When I first saw the wagon it was broadside across the track, and the car hit it towards the rear—that is, the side and hind wheel; turned it around and

turned it over in the street and the horse was facing east; turned the wagon over."

Those two men were passengers on the car and were near the front of it.

Nelson R. Taylor, the motorman, testified:

"What is your occupation? A. Running a restaurant.

"Q. Where? A. 2202 Cass avenue.

"Q. Last December at the time this accident occured I believe you were a motorman on one of the Transit Company's cars? A. Yes, sir.

"Q. Were you the motorman on this car that struck this wagon? A. Yes, sir.

"Q. Now, I will get you to state to the jury just how that accident occurred, in your own way? A. The accident was between Vandeventer avenue and Sarah street. When I was approaching near the center of the block I noticed a one-horse covered wagon ahead of me going west on the south track; and when within about fifty feet of the wagon he turned over to cross the north track and the car struck him.

"Q. What was the position of the wagon in reference to the car at the time the car hit him? A. It was on an angle; crossing the track on an angle.

"Q. Where did the car strike the wagon? A. On the corner; it wasn't in the center; it was the hind wheel.

"Q. The hind wheel on the right-hand side? A. Yes, sir.

"Q. When you saw the man turning across the track as you have described, how far did you say you were from him? A. About fifty feet, I should think.

"Q. What was the condition of the track that morning? A. Well, it was a little slippery.

"Q. Raining, was it? A. A little slippery; it was raining.

"Q. Now, then, about what speed were you run-

ning at the time he turned in across your track? A. Well, about fourteen miles an hour.

"Q. Running between the streets? A. Yes, sir.

"Q. As soon as you saw him turn across your track what did you do? A. I threw off the current and went to apply the brake, but I didn't get the brake on very strong before I struck him.

"Q. When you struck the wagon what effect did that have on the car and on you? A. The car — it slackened the car, and the glass in the vestibule flew back in my face and I stepped back.

"Q. It broke the glass in the vestibule? A. Yes, sir.

"Q. That caused you to leave your motor, did it? A. Yes, sir."

E. W. Moore, the conductor, gave this account:

"I was up standing about four feet from—four seats from the front of the car, taking the register statement. We generally go through there with full speed between Vandeventer and Sarah, and I felt the vibration of the motorman stopping and I looked out and it wasn't an instant until I saw the wagon broadside of the track, and another instant the car struck it and throwed it out at the north side of the track; and I should judge the car ran possibly one hundred—seventy-five or a hundred feet after that. Then I got off and went back there. The driver got out and unhitched the horse. I let the car go west and I stayed there and got the witnesses' names.

"Q. What was the position of the wagon on the track when you first observed it? A. When I first observed it the wagon was broadside of the car, running on an angle.

"Q. You mean diagonally? A. Yes, sir; the horse was facing practically about northwest, I should judge, and the wagon was right square on the track, broadside.

"Q. What part of the wagon did the car strike, if

you know? A. Why, I saw the car strike the rear side of the wagon—back side, about—well, I should judge by the back wheels.

"Q. About the back wheels? A. Yes, sir, I couldn't see the wheels, but I should judge that it was struck there.

"Q. State whether the horse had passed over the track? A. The horse was just crossing the track. He was about half out of the track—half off when I first saw them."

Counsel for the defendant asked us to consider this case and the one by Hoppe to recover for his personal injuries, together; for the reason that in the latter case plaintiff introduced a witness by the name of Hanigan who did not testify in this one. Hanigan's testimony is substantially like Fahy's.

The petition counts exclusively on the violation of that clause of an ordinance of the city of St. Louis regulating the management of street cars, which provides that the person in charge of a car shall keep a vigilant watch for all vehicles or persons on foot, either on the track or moving toward it, and upon the first appearance of danger to any person or vehicle, shall stop the car in the shortest time and space possible.

The averments of negligence are that the defendant's employees in charge of the car in question disobeyed said clause, either by failure to keep a vigilant watch for vehicles, or if they kept watch, failed to stop the car when they saw it was in danger of colliding with plaintiff's wagon, in the shortest time and space possible.

The instructions submitted the case to the jury on the issues of whether the ordinance was violated in either of the ways alternatively averred.

GOODE, J. (after stating the facts as above).— If we accept as true the testimony given for the defendant, no case was established by the plaintiff. The only

tendency of that testimony was to prove the horse and wagon were driven from the south track across the north one so close to the approaching car as to render a col-. lision unavoidable by any exertion the motorman could make.    It is true the jury might have believed the wagon was crossing, instead of running along, the north track when the car struck it and have believed, too, that it was far enough ahead of the car when the danger of a collision first appeared, for the accident to have been averted by prompt measures on the part of the motor-man.    It is conceivable that, the wagon being on the north track, the driver heard the car when it was almost on him and suddenly steered the horse towards the north, so that the car struck the right side of the vehicle, whirling it and the horse around and throwing them on their left sides, headed to the east, as they lay the instant after the accident.    That the horse could have struggled into that position afterwards is also credible. But all these theories of how the conceded effect might have been caused, receive no countenance from the evidence, but are excluded from consideration by positive testimony to the contrary.    No inference that it was within the power of the motorman, by the most extreme efforts, to stop the car before reaching the wagon as it passed over the north track, could be properly drawn from the testimony of the defendant's witnesses; while the plaintiff's witnesses adhered tenaciously to the story of a square rear-end collision as the wagon was running on the rails, with the result of immediately knocking it and the horse into a position the reverse of the one they were in the previous moment.

Besides, the negligence of which the plaintiff complains in the petition was running the car against his wagon while the latter proceeded along the rails.

Opposed to the suggested possibilities on which the plaintiff might have a case, we encounter, therefore, two rules of practice:    First, that the very act of negligence alleged must be proven, if a specified act is

alleged.    McCarty v. Hotel Co., 144 Mo. 397; Fuchs v. St. Louis, 167 Mo. 620.    Second, mere surmises and conjectures, unsupported by any evidence, afford no valid ground for a verdict.    Whatever inferences fair-minded men can rationally deduce from testimony, juries are at liberty to adopt as the basis of a decision; but not some speculation conceivably true, but which can as well be false for aught that is proven.    Moore v. Railroad, 28 Mo. App. 622; Peck v. Railroad, 31 Mo. App. 123; Zurfluh v. Railroad, 46 Mo. App. 636; Sheldon v. Railroad, 29 Barb. 226.    Inferences which warrant a verdict are those derived from the force of the evidence; not plausible, but, perchance, wholly mistaken surmises of what the truth is.    Smart v. Kansas City, 91 Mo. App. 586.    From this principle, together with the presumption in favor of right conduct, it follows that a party who seeks redress from another on account of some asserted omission of duty by the latter, must fail unless proof is brought forward to show in what manner the default occurred.    Stepp v. Railroad, 85 Mo. 229; Smart v. Kansas City, supra; Fuchs v. St. Louis, supra; Skipton v. Railroad, 82 Mo. App. 134.

The verdict must stand or fall on the testimony of the plaintiff's witnesses, and this question confronts us:    What influence ought their testimony to carry in view of the conceded fact that the horse and wagon were turned half way round by the force of the car? According to those witnesses, the vehicle was moving on the rails of the north track and the horse in the center of the space between the rails.    Freakish effects are sometimes caused by violent impacts of moving bodies, and we are perhaps not warranted to pronounce that the horse and wagon could not have been turned end for end by a straight blow from behind.    But after revolving the problem a great deal, we will say that we are unable to conceive how such a consequence could happen.    Its extreme improbability, whether tested by experience or by the accepted laws of motion and mechan-

ics, combined with the testimony of disinterested men that the car struck the wagon a side blow instead of a rear one, and thereby naturally knocked the wagon and horse about, have produced the conviction that a miscarriage of justice occurred at the trial. The manner of the collision as described by defendant's witnesses, consists perfectly with the result that would almost certainly follow a side collision; while the opposite version is nearly or quite incredible, so incompatible is it with the undenied position of the property immediately subsequent to the accident.

Verdicts resting on evidence which looks contrary to the ordinary course of nature are not infrequently set aside and retrials directed by appellate courts, as a proper precaution against an unjust outcome of litigation. While it is fundamental that juries must weigh evidence and trial judges revise their findings, instances happen in which, from one cause or another, this practice so obviously failed to work out a right result that an imperative call is heard to supplement it by an exceptional procedure in order that justice, the end of all procedure, may not be frustrated. This prerogative of courts of error is sparingly employed; but that it exists, as an emergency expedient, for the correction of verdicts palpably wrong, is certain. The appropriate use of it does not require a court to be convinced that the jury found an event to have occurred that was physically impossible or miraculous. It is enough if the event found was so improbable according to the ordinary operation of physical forces, or was so overwhelmingly disproved by credible witnesses, as to compel the conviction that the jury either failed to weigh the evidence carefully, or drew unwarranted inferences, or yielded to a partisan bias.

We have decided to grant another trial of this cause, having reached that decision, not only after much reflection on the evidence, but after a study of the precedents in this state in which a similar course was taken.

They are more numerous than we supposed; thus demonstrating that while appellate tribunals are reluctant to interfere with verdicts on the score of insufficient evidence, they are more reluctant to accept as conclusive one given at the first hearing, if it can not be accounted for by rational theories.

A prominent case is Spohn v. Missouri Pacific Ry. Co., 87 Mo. 74, in which the plaintiff's story was that he had been frightened into leaping from a moving train and injuring himself, by the threats of the conductor of the train and some other men to tie and rob him. The verdict for that plaintiff was set aside not because he told an impossible story, but one so strange and improbable that the jury's decision must have resulted from partiality or prejudice, rendering a new trial indispensable to the due administration of the law. This appellate action was taken without the existence of natural facts to refute the plaintiff's case and solely for the reason that it was overborne by contrary evidence and weakened by its improbability.

In State v. Fannon, 158 Mo. 149, it was ruled that certain incredible testimony would be rejected.

In Payne v. Railroad, 136 Mo. 362; Hook v. Railroad, 162 Mo. 569, and other cases, the Supreme Court has refused to allow probative value to the oath of witnesses that they could not see a railroad train when it was in plain sight in daylight.

In Payne v. Railroad, supra, many decisions to that effect are arrayed.

In the Hook case, the majority opinion says:

"The court will treat as unsaid by a witness that which in the very nature of things could not be as said. Though this court will not undertake to measure the probative force of the conflicting testimony of witnesses upon controverted issues of facts, but under our system of practice leaves those matters where the trial court has left them, to the juries, for determination, -still it is not so deaf to the voice of nature or so blind to the

laws of physics that every utterance of a witness, in derogation of those laws, will be treated as testimony of probative value for the consideration of the jury, simply because of its utterance.''

Is it more unlikely that some strange failure of vision, or some mental lapse which prevented visible objects from making an impression on the consciousness, should occur, than that a car should strike a wagon squarely behind and throw it and a horse hitched to it into the position plaintiff's were found in after this accident? It is to be remarked, too, that Hoppe swore he looked all the time for a car but did not see any, although there was no hindrance to his seeing the one that hurt him; thereby further discrediting his testimony. The fact that he saw the car would not, however, excuse the defendant from the collision, if its servants saw the wagon in time to avoid striking it.

In Nugent v. Milling Co., 131 Mo. 241, the opinion said, relative to some evidence deemed to state an impossible occurrence:

''The statements by a witness of the existence or the non-existence, the occurrence or non-occurrence, of a given thing as a fact that contravenes all laws of mechanics and philosophy that are so generally recognized that courts can not ignore them, can not be said to be matters of fact that must go to the jury for their consideration as to their credibility, on the proposition that the jury are the triers of all the facts in a suit at law.''

Those authorities suffice to exhibit the different aspects in which the question of disallowing weight to evidence on account of its inherent improbability, has been viewed. There are many others (some of them we cite) in which verdicts have been set aside on that ground alone. Baker v. Stonebraker, 36 Mo. 338; Whitsett v. Ransom, 79 Id. 258; Freiz v. Fallon, 24 Mo. App. 439; Empey v. Ry. Co., 45 Mo. App. 422; Walton v. Ry. Co., 49 Id. 620; Glick v. Railway, 57 Id. 97. The war-

rant for appellate interference of this character is a finding by the jury incomprehensible on any theory consistent with a proper regard for their duty to determine issues according to law and evidence. And such findings are not always due to bias; but now and then, as has been indicated, to some mistake concerning the evidence or to deciding on a conjecture or surmise it does not countenance.

We are not unmindful that a verdict was returned for Hoppe on the same evidence we have before us in this case; but while that fact has given us pause, it has not overcome our conviction that the issues ought to be retried.

The disposition of juries in this sort of litigation, as brought to our attention in numerous causes reviewed by us, warns us against accepting at once a finding so unlikely to be right as the one in hand. We are forced to and do tolerate verdicts which strike us as against the great weight of the evidence, when trial judges let them stand. But if there is no substantial testimony to support the verdict, or we believe physical facts point to its unsoundness, the cited cases show it is our duty to interfere to prevent the unjust transfer of money or property from one party to the other.

The judgment is reversed and the cause remanded. *Bland, P. J.,* and *Reyburn, J.,* concur.