W. F. HARPER, Respondent, v. ST. LOUIS AND
SAN FRANCISCO RAILROAD COMPANY, Ap-
pellant.

**Springfield Court of Appeals, December 31, 1914.**

1. **APPEAL AND ERROR: Assault by Railroad Brakeman: Re-
view of Evidence: Bias and Prejudice.**  Action because of
injuries received by reason of an alleged assault on plaintiff by
a brakeman and a news agent on defendant's train.  Evidence
examined and summarized.  The verdict of the jury is con-
sidered so much against the weight of the evidence as mani-
festly to be the result of prejudice and bias.

2. ————: **Verdict Against Weight of Evidence: Bias and
Prejudice: Reversal.**  Where from the overwhelming weight of
the evidence it can only be concluded that passion and prejudice
controlled the jury and where the amount allowed shows passion
and prejudice, the appellate court should reverse the judgment
and remand the case for a new trial instead of reducing the
verdict.

Appeal from Pemiscot County Circuit Court.—*Hon.
Frank Kelly,* Judge.

REVERSED AND REMANDED.

*W. F. Evans, Moses Whybark* and *A. P. Steward*
for appellants.

*Ward & Collins* for respondent.

FARRINGTON, J.—A judgment was rendered in
the circuit court of Pemiscot county for the sum of
two thousand dollars in plaintiff's favor.  His cause
of action was based upon an alleged assault made
upon him by the defendant's brakeman, and the said
brakeman knowingly permitting a news agent on the
train to assault plaintiff.  From the record we gather
that there had been a former trial of this case which
for some reason not appearing did not result in a

final determination. When this trial was had, result-
ing in the judgment appealed from, a verdict for five
thousand dollars actual damages was returned which
ten of the jurors signed. While a motion for a new
trial was pending, in which complaint was made that
the verdict was excessive and the result of bias and
prejudice, the trial judge required plaintiff to enter
a remittitur of three thousand dollars of the verdict,
which he did, and judgment was then rendered for two
thousand dollars and the motion for new trial over-
ruled.

The defendant (appellant) assigns a number of
errors which we have examined and find that none
would justify a reversal excepting the one we will dis-
cuss in this opinion, namely: "Because the verdict
of the jury is so much against the evidence as mani-
festly to be the result of bias or prejudice.

We think the record sustains appellant's conten-
tion; and realizing that it is only in extraordinary and
extreme cases where appellate courts grant new trials
on the ground that the judgment is against the weight
of the evidence when the trial court has refused to do
so, but entered a remittitur instead, we have, after
much consideration, concluded that the interests of jus-
tice require that this case be retried. The trial judge
found that the verdict was so excessive as to demand
that it be reduced. In such cases it is to some extent
discretionary whether the verdict be reduced by remit-
titur or a new trial be granted; and that discretion is
subject to review by this court. In some cases, the
demands of justice may be met by a remittitur; in
others, only by a new trial.

Plaintiff testified that at the time of the trial he
resided at Blytheville, was fifty-four
**Plaintiff's** years old, a member of the church, and did
**Account of**
**His Case.** . not get drunk; that in August, 1912, he
was running a hotel at Luxora, Ark., and
that in his business he sold soda pop at five cents a.

bottle; that on Sunday morning, August 11, 1912, he boarded one of defendant's northbound trains, having purchased a ticket to Caruthersville, Mo., and took a seat in the smoking car beside a man whom he did not know and has not since seen and began talking to him; that during the journey he bought two bottles of soda pop from a news agent, paying ten cents a bottle, and drank one and gave the other to the man beside him, and when they had finished he took both bottles and threw them out of the car window; that this occurred at a point some three or four miles below Caruthersville. He testified that when the news agent charged him ten cents a bottle for the pop, he remarked, "This is more than I am in the habit of paying," and that the news agent replied, "It is none of your damn business how much we sell soda for;" that when he threw the bottles out the window, the news agent said, "You son-of-a-bitch, I'll learn you how to throw my bottles away," and began fighting him and broke a glass bottle over his head, and that while this was going on the defendant's brakeman came up and grabbed plaintiff by the right arm, pulled it back over the seat, and said, "Put in on the son-of-a-bitch, he needs it." Plaintiff testified that he was struck several times with the glass bottle while his arm was being held back by the brakeman; that the result was some scalp wounds, which bled profusely, and a few minutes of unconsciousness; that as a result of the brakeman pulling his arm around back of the seat it has been in such shape since that he could not use it; that he cannot lift anything or use his arm to amount to anything and that it pains him all the time, and that he has to carry it with his hand or thumb resting in his shirt bosom like a sling. He testified that he lost two months' time when he could do nothing and that his time was worth fifty dollars per month; that since that time he has been canvassing and selling fruit trees, but that his arm pains him and he cannot write with his

right hand; that before the assault he was right-handed and that his right arm was larger than his left, but that since then and for several months prior to this trial the right arm has been one-half inch smaller than his left and he had a doctor measure his arms. The trouble occurred on August 11, 1912. This trial was had on July 30, 1913. The injuries to his head soon healed and he claimed no damages for permanent injuries except as to his arm. He testified that when he reached Caruthersville he was cut about the head and was bleeding and that he went to Mr. Butler's barber shop and had him wash and clean him up and that the barber then put a bandage on his head; that he then went out on the street and met Lee Hooper, an acquaintance of five years, who conducted a saloon; that he told Hooper of the trouble and complained of his arm hurting and that Hooper took him to the office of Doctor Phipps who gave him an "antiseptic" that put him to sleep, and that the doctor put his arm back in place and bandaged it. On cross-examination he was asked: "Did he put a bandage on or simply put your arm in a sling?" He answered: "He put a bandage on." Plaintiff testified that the doctor charged him twenty-two dollars, and that he had also expended some fifteen dollars for liniments, ointments and the like. He testified that that same afternoon he telephoned and had a lawyer come down town where he met him (in the lawyer's office). Plaintiff admitted that he had used a hoe a little in his garden, but only with his left hand, and that he had used his left hand in setting out some trees. He could not remember whether there was more than one news agent on the train. He was asked if he tried to buy any more soda pop after they beat him up, and he replied, "I believe I did; I am not sure." "Q. From the same fellow? A. Well, it might have been." He testified that the fight was with the same news agent that sold him the two bottles at ten cents each; that he knew but

one man on the train who saw the fight, a Mr. Mayhon who lived at Blytheville, plaintiff's home at the time of the trial; this man was not a witness in the trial. Plaintiff testified that from the time he boarded the train until he alighted at Caruthersville he did not leave his seat with the possible exception that he may have gone to get a drink of water once.

C. E. Butler, the barber, testified that he washed plaintiff's head and saw one or two cut places **Plaintiff's** in his scalp and found a small piece of **Witnesses.** glass, but that *he did not* put a bandage on plaintiff's head; that plaintiff held his arm down at his side; that he did not know whether plaintiff was "grunting" from his arm or his head. He testified: *"Wasn't complaining of his arm in particular.* Could not say what his condition was as to being drunk or sober; he was 'grunting' and 'taking on' so much."

Lee Hooper testified that he met plaintiff on the street after the latter came out of the barber shop and that he complained of injuries to his shoulder and that the witness took him to Doctor Phipps' office; that plaintiff was holding his right hand down by his side; that he (the witness) saw the doctor examine the arm and give plaintiff a hypodermic, and saw the doctor prepare to bandage the arm, but left the office before this was done. He testified that plaintiff was not intoxicated but that he did not know whether or not plaintiff had been drinking.

Doctor Phipps testified for plaintiff that the injured man came to his office and that he treated the cuts in the scalp and put a bandage on plaintiff's head, and went into detail about the treatment to the head. *He did not recall* that plaintiff complained of his *arm* or that he treated or bandaged the arm or that he gave plaintiff a hypodermic injection; *nor did he recall that anything was wrong with plaintiff's arm,* and thinks he would remember if he bandaged the arm. He thought from plaintiff's action *that he had been drink-*

*ing some.* ·He testified that he might have charged plaintiff two dollars, but that *he did not charge him anything like twenty-two dollars;* that *he made no charge on his books* as plaintiff paid him cash at the time, and that he has no account against plaintiff for any amount.

In rebuttal, J. F. Sanders testified that since the last of January or the first of February before the trial in July, plaintiff had resided next door to him and that he had heard plaintiff complain of his arm and had seen plaintiff carry his right hand in his bosom or his watch ·pocket; that he saw plaintiff set out some trees for Mr. Collins, but that he only held on with his left hand while some one else filled in around them. Quoting from his testimony: ''I am swearing I never saw him set out any trees himself or dig the holes himself. So far as I know he may have done that.''

Plaintiff's uncle, J. H. Harper, saw plaintiff frequently after the trouble in August. He travels and makes his headquarters at Nashville, Tenn. He testified that his nephew has not been able to use his right arm—that ''he had not seen him use it.'' He had seen plaintiff carry the arm in a sling or in his shirt. He testified that plaintiff had been taking some orders for him but had done no manual labor.

Doctor Conrad testified that he had examined plaintiff's arm in February before the trial in July, and that he thought it measured *one-eighth* of an inch smaller than the left arm, but he could not tell whether plaintiff was left-handed or not. He testified that the day after plaintiff was injured he saw plaintiff's arm in a *sling* and that plaintiff *told* him it was *bandaged.* He does not say that he saw a bandage on plaintiff's shoulder. He testified that plaintiff wanted him to take the bandage off but that he did not do so. He said he testified in a former trial of this case and that he did not think the injury was necessarily a perma-

nent one and that he thought possibly there would be
an improvement; that he had never examined plain-
tiff's arm but once which was in February, some six
months prior to the trial; that when he did examine it,
the shoulder had the appearance of being struck,
crushed or mashed at some previous time.

It will be seen that the evidence of plaintiff's wit-
nesses bears the stamp of negative rather than posi-
tive testimony.

Plaintiff in rebuttal denied some of the evidence
introduced by the defendant, but did not explain why
he went to Doctor Conrad the day after the injury
instead of going back to Doctor Phipps who had treated
and bandaged his arm, as he says, the day before.

We have emphasized some of the things concerning
which plaintiff's own witnesses contradict him.

C. M. McCleary testified that he was acting as a
helper to O. A. Owens the news agent with
**Defendant's Evidence.** whom plaintiff had a fight; that when he
(McCleary) sold plaintiff the soda pop
plaintiff was in the chair car; that when he went back
to get the bottles plaintiff informed him that he had
bought them and had a right to throw them away;
that "when plaintiff raised up, he saw that plaintiff
was going to make trouble," and that he left and went
into the smoking car, telling plaintiff he would give him
the bottles, but that plaintiff got up and followed into
the smoking car where he called the witness "several
sons-of-bitches" and "a God damn liar;" that plain-
tiff followed him up and down the aisle and called him
these vile names several times, but that he did not
strike the plaintiff; that he was in the smoking car
when plaintiff called Owens, the head news agent, vile
names; that Owens thereupon hit him with a bottle
and struck him in the face and on the head a number
of times; that while this was going on, Pat Kelleher,
the brakeman, came up, pulled Owens off the plaintiff
and pushed him away, but did not hit the plaintiff or

take hold of his arm in any way and pull it around the seat, or say to Owens to "put it on him;" that Kelleher did nothing but separate them and stop the trouble. He testified that plaintiff was intoxicated while on this train.

Owens corroborates McCleary as to what took place in the smoking car. He testified that he heard plaintiff cursing McCleary; that plaintiff called him (Owens) "a God damn thief;" that when plaintiff did so the witness began fighting, striking plaintiff over the head with a glass candy horn which broke; that Kelleher did nothing but come up and pull him off the plaintiff and push him away; that Kelleher did not at that time touch the plaintiff or twist his arm around the seat. He testified that plaintiff had been going up and down the aisle cursing; that plaintiff was drunk and that he could smell whiskey on his breath; that he would curse McCleary every time he came in the smoking car.

Kelleher testified that he was the brakeman on the train and was seated in the back of the car in which the trouble occurred; that when he saw it he came up, pulled off Owens, and did not at any time strike or touch plaintiff except to put his hand on plaintiff's breast to push him into his seat when he started to get up and follow Owens after he (Kelleher) had separated them; and that he separated them as soon as he could after the fight begun. He testified that plaintiff appeared to be intoxicated and was cursing and swearing at the news boys.

The conductor saw none of the trouble. He did testify that he saw the plaintiff walking up and down the aisles and that he had the appearance of having been drinking.

Defendant then introduced some witnesses whose testimony we will next summarize who were mere spectators, some of whom were neighbors of the plaintiff. No attempt was made to show that they bear any ill-

will toward the plaintiff or are in any way interested in the outcome of this lawsuit. Some of them do admit that they were paid their expenses and three dollars a day for their time in coming to court as witnesses for the defendant.

John Johnson testified that he resides at Blytheville and knows plaintiff; that he was seated in the smoking car of the train in question and that plaintiff while in there acted like a man that was drinking; that he heard plaintiff cursing the news agents; that there were two news agents on the train; that he saw plaintiff come into the smoking car following the news agent and heard him make remarks about the train crew stealing and call the news agent vile names; that he saw the brakeman separate them and that the brakeman took no part whatever in the fight; that when plaintiff started to raise up after the fight the brakeman did push him back in his seat; that plaintiff lives about a block from him in Blytheville; that he has observed plaintiff and that plaintiff did not carry his arm in a sling or in his bosom until the witness saw him at the other term of court, when plaintiff claimed he was "crippled up;" that he has seen plaintiff setting out shade trees and digging the holes with both hands at Doctor London's home and that this was between July at the time of the trial and February or March preceding.

C. Litton, who lives at Marked Tree, Ark., saw plaintiff board the northbound train at Luxora, August 11, 1912. He testified that plaintiff was drinking at the time and that "he had been drinking all morning and pretty well all night before;" that he knows plaintiff as a man that gets drunk.

C. E. Hurley testified that he lives at Blytheville; that he knew plaintiff from February 9, 1913, to June 20, 1913; that he lived close to plaintiff but never saw him carry his arm in a sling and that he saw plaintiff every day; that the first time he saw plaintiff carrying

his arm that way was on the day of the trial; that he had seen plaintiff hoeing and planting beans in his garden and using both hands; that he talked to plaintiff over the garden fence where he was twenty or thirty feet from plaintiff and saw him using both hands in hoeing.

Alf Mason who lives at Caruthersville saw plaintiff in April or May, 1913, setting out trees and testified that plaintiff was digging holes with a spade and using both hands.

Robert Lee Fisher testified that he was on the train in the smoking car and saw plaintiff; that plaintiff had the appearance of being a drunk man; that he heard plaintiff cursing the news agents, calling them "sons-of-bitches," before he got into the fight; that he saw the fight and saw the brakeman separate them, pushing the news agent away and making plaintiff sit down; that the brakeman did not grab plaintiff by the arm and pull it over the seat; that he was only three or four seats away from the plaintiff; that he was right there looking on at the fight and he testified that the brakeman did not touch plaintiff's arm.

Jeff Collier's deposition was introduced. He also saw the fight in the smoking car. He stated that plaintiff acted like he was intoxicated and that his conduct was very bad; that he was cursing and swearing and calling the news agents vile names; that he saw the trouble and that the brakeman did not pull plaintiff's arm around back of the seat.

This was the case put to the jury—the evidence on which they returned a verdict for five thousand dollars actual damages against this defendant.

The vital issue was whether or not the brakeman joined in the fight to injure plaintiff and pulled plaintiff's arm around the seat as described by the plaintiff, or was in good faith trying to stop the fight as it was his duty to do. It will be noted upon reading the

186MoApp20

foregoing summary of the evidence that on this point the plaintiff's testimony stands alone against that of the witnesses for the defendant, some of whom may be termed "interested," but some of whom are shown to have no interest in the case nor any ill-will toward the plaintiff. Plaintiff is not corroborated by his neighbors, the witnesses who had observed him since the fight with reference to the use of his arm. In no material respect is his description of his conduct on the train and of what took place corroborated in a single instance or circumstance. He differs with his witness, the barber, as to what the barber did, and he differs with his witness, Doctor Phipps, as to what the doctor did in his only treatment of plaintiff. We therefore have the plaintiff's testimony, which, standing alone, makes a case which should be submitted to the jury, but one which is uncorroborated in practically every particular and denied by all the eyewitnesses and those with whom he came in contact, not only as to what took place on the train but as to what occurred shortly afterward and on down to the day of the trial. It is indeed strange that plaintiff should go practically a whole year lacking only a few days, during all of which time his arm was paining him, useless, benumbed, crippled, and getting worse, without once consulting a physician for advice or treatment. According to his own testimony, the only time, after the day of the injury, that he consulted a physician was when he went to have his arm measured. As to this, plaintiff says the doctor found the difference in size in his two arms to be one-half inch, whereas the doctor says he found a difference of about one-eighth of an inch. Immediately after he was injured he procured the services of a physician, but from that day henceforth to the good day of judgment he never again sought the services of a doctor to attend his alleged injuries.

It is impossible to understand how a fair and impartial body of men could arrive at the result this jury

reached under the evidence had they followed the instructions of the court; and we can conceive of their action and attribute the reason therefor to nothing short of passion and prejudice.

Although it is true that the decisions in this State hold that an excessive verdict is not necessarily the result of passion and prejudice, it is an evidence of passion and prejudice. We have a verdict returned by this jury which the trial judge refused to let stand, having required the plaintiff to remit three thousand dollars of it before the motion for new trial was overruled. This, to our minds, is some evidence that as to *amount* the trial court found they had acted with passion and prejudice. When a case is presented to a jury and the overwhelming weight of the evidence is against the finding of the jury and where the verdict itself bespeaks passion and prejudice, nothing short of a reversal of the judgment and a remanding of the case can meet the ends of justice.

It is true that in the case of Cook v. Globe Printing Co., 227 Mo. 471, 127 S. W. 332, the Supreme Court required a remittitur of an enormous sum of money and still upheld the verdict; but upon reading that opinion it will be seen that in the beginning of the discussion of this question the court said there was no error in the instructions, no error in admitting evidence and no misconduct shown on the part of the jury, and, continuing—"*that the publication, which is a basis of the action, was libelous, we think there can be no doubt whatever.*" (Italics are ours.) In that case, the court on viewing the evidence which was before it found that plaintiff had a cause of action on the merits, and, since it concluded therefrom that plaintiff was entitled to recover, could not attribute passion and prejudice to the jury in finding the very thing that the court itself would have found. There was left in that case only the question as to the *amount* to be given.

Our attention has not been called to a single case in which the court would say that the overwhelming weight of the evidence is against the plaintiff's contention on the merits, where it said a remittitur was proper; because, in such a case, where there is evidence of passion and prejudice on the party of the jury, to-wit, in the amount of the verdict, the court cannot say. that the same passion and prejudice did not contaminate the finding of *liability*.

The law entitles litigants to a fair trial before an impartial jury; and where an appellate court comes to the conclusion that either the plaintiff or the defendant has not been accorded his rights in this respect, it is not only their privilege but their sworn duty to see that justice is sustained, and if necessary it must grant a new trial, even though the trial court failed in its duty so to do. A remittitur in such a case does not meet the requirements of fair dealing and justice. If the defendant in this case is not liable, then as great an injustice is perpetrated on it should the verdict be for one dollar in amount. The result of injustice may be *lessened* by the smaller verdict, but justice is not subject to either long or short division; the decimal point should be after the word and not between the letters. There is a long line of decisions in this State holding that where a proper administration of the law to the end that justice be done requires that a new trial be had, an appellate court will see that it is granted. [See, Spohn v. Railway Co., 87 Mo. 74; Baker v. Stonebraker's Admrs., 36 Mo. 345; Price v. Evans, 49 Mo. 396; Lehnick v. Street Ry. Co., 118 Mo. App. 611, 94 S. W. 996; Chitty v. Railway Co., 148 Mo. 64, 49 S. W. 868.] The closing lines of the opinion in the case of Garrett v. Greenwell, 92 Mo. l. c. 125, 4 S. W. 441, are as follows: "Looking at all these things, it is a matter of profound surprise that the jury, with all this evidence before them, could have found as they did. But, inasmuch as they have done so, our duty, under

the rule announced in the case of Whitsett v. Ransom, 79 Mo. 258, and Spohn v. Railroad, 87 Mo. 74, is clear, and so the judgment is reversed and the cause remanded. All concur." Again this language was used in the case of State v. Primm, 98 Mo. l. c. 372, 373, 11 S. W. 732: "This must be true if any reliance is to be placed upon human testimony, and there was no attempt made to impeach the witnesses who contradicted the prosecutrix on so many important particulars as aforesaid. The result obtained by the verdict must therefore be ascribed to prejudice, passion or partiality and not to that calm weighing of the facts in evidence which should always characterize the deliberations of a jury. On such occasions this court does not hesitate to interfere as is attested by our decisions (citing cases). This is the rule uniformly announced in civil cases, and in those which are criminal, we have never abdicated the right we possess to overturn verdicts which are not based upon the corner stone of substantial justice. [State v. Packwood, 26 Mo. 340; State v. Burgdorf, 53 Mo. 65; State v. Mansfield, 41 Mo. 470; State v. Daubert, 42 Mo. 238; State v. Brosius, 39 Mo. 534; State v. Jaeger, 66 Mo. 173; State v. Castor, 93 Mo. 242.]" The reason of the rule is well stated in Elliott's work on Appellate Procedure, section 21, as follows: "It is inconceivable that a high court of justice, such as an appellate tribunal, may not, upon an investigation of the record, so frame its judgment as to prevent the defeat of justice by technical and arbitrary rules. The denial of this right involves the affirmation that the highest courts cannot award justice, and this conclusion cannot be vindicated, since the underlying and sovereign principle is that the right of appeal insures to litigants who have obeyed the substantive rules of law and conformed to the rules of procedure a judgment awarding them justice under the laws of the land. It must be true, therefore, that a high appellate tribunal may deliver and enforce a judg-

ment that will prevent wrong and award justice to the parties entitled to it." [See, also, Caruth v. Richeson, 96 Mo. l. c. 192, 9 S. W. 633, and Spiro v. Transit Co., 102 Mo. App. 250, 76 S. W. 684.] A case similar on its facts to the one before us is that of Germann v. Great Northern Ry. Co. (Minn.), 130 N. W. 1021, where the court held that the remittitur ordered by the trial judge would not suffice in such a case and that the trial court should have gone a step further and ordered a new trial.

We feel that as plaintiff's testimony on the vital question of whether or not the brakeman did what plaintiff says he did is unsupported by any eyewitness, and that as on other material questions in the case his testimony is disputed by not only the defendant's disinterested, unimpeached witnesses, but by his own witnesses as well, the verdict of the jury in plaintiff's favor was the result of passion and prejudice against the defendant, and that justice demands that a fair and impartial jury try the issues. The judgment must accordingly be reversed and the cause remanded for a new trial. *Robertson, P. J.,* and *Sturgis, J.,* concur.